HAMITER, Justice.
On November 17, 1959 the State of Louisiana, through the Department of Highways, instituted the instant suit under the authority of Article VI, Section 19.1 of the Louisiana Constitution and LRS 48 :- 441-460, to acquire by expropriation a strip of land some 300 feet in width and several thousand feet in length which contains 48.-468 acres belonging to the Lagonda Trust (hereafter referred to as Lagonda), represented by Edward D. Rapier, Trustee, and is located in the Parish of St. Mary. In connection with the action plaintiff deposited $11,000 in the registry of the court in compensation of the taking, this being the amount fixed by its two expert appraisers as the fair market value of the property.
Pursuant to the aforementioned provisions the district court approved the expropriation. The signed order granted the desired right of way to plaintiff, reserving to the defendant the mineral interest in the property in accordance with LRS 9:5806.
Subsequently, the defendant, Edward D. Rapier, Trustee of Lagonda, answered, he alleging that the real market value of the expropriated property as of the taking was $87,300 (no question of severance or consequential damages is involved). He prayed for a judgment in that amount, less the sum deposited.
Following a trial the district court found the true market value of the right of way to be $79,099.80, and it rendered judgment in favor of the defendant for that sum less the $11,000 already deposited.
On an appeal, the Court of Appeal of the First Circuit affirmed the judgment. 152 So.2d 272.
At the instance of plaintiff a majority of this court granted certiorari (244 La. 674, 153 So.2d 885), they feeling principally that the value as fixed by plaintiff’s appraisers and that determined by the Court of Appeal was too widely divergent. The minority thought the application presented only questions of fact. Nevertheless, by virtue of the issuance of the writ the entire case is now before us for consideration (on questions of both law and fact), just as if it had been brought directly here on an ap *155 peal. Article VII, Section 11, Louisiana Constitution.
The Court of Appeal correctly-recognized that in an expropriation suit of this nature the proper measure of compensation is the market value of the thing taken, i. e., the price for which the property could be sold by a willing and informed seller to a willing and informed buyer in the condition in which it stood, as well as under the usual circumstances existing, at the time of the expropriation. Further, as it said, market value means the worth of the land considered in the light of its best and highest use, this being the most favorable employment to which the property is adaptable and may reasonably be put in the not too distant future. In this connection the Court of Appeal aptly stated: “ * * * Potential residential subdivision or industrial use, to serve as the basis of establishing market value in an expropriation proceeding must be shown to be reasonably prospective, as distinguished from remotely prospective, to remove such potential use or classification from the realm of guesswork, speculation and conjecture. If such potential future use is shown within the reasonably near future, the owner is entitled to compensation on the basis of such use notwithstanding the property is not being utilized for such use at the time of taking. * * * ” Moreover, as the court observed, the landowner bears the burden of proving his claim for additional compensation to a legal certainty and by a preponderance of the evidence. And the cases cited in the Court of Appeal opinion amply sustain all of these well established rules for determining value of expropriated property.
With these legal principles in mind we turn our attention to the land in question and to a determination of whether the defendant landowner has discharged the burden of proof which was his.
Anent the property taken, the Court of Appeal has well and properly observed: “The property in question is situated approximately five miles west of the twin cities of Morgan City and Berwick which lie on the east and west sides, respectively, of Berwick Bay, and approximately one mile east of the Town of Patterson, St. Mary Parish, on a comparatively narrow strip of twisting high land varying in width from one to four miles and known as the Teche Ridge. The record reveals that Teche Ridge lies between the gulf marshes on the south and Six Mile Lake, Flat Lake, Lake Palourde and certain inaccessible swamps to the north. It is undisputed that lands situated on Teche Ridge have become valuable in recent years due to the scarcity of high lands in the vicinity of Morgan City and Berwick. The record reveals that for some years preceding the taking of defendant’s property, high lands in the area have been very much in demand and eagerly sought after for use for industrial as well as residential subdivision purposes. In this regard it is conceded that the Morgan City-Berwick area has become highly industrialized *157 because of revived and increased interest in certain industries such as off shore oil drilling, maritime pursuits and commercial fishing. It further appears that because of the industrial and population influx high land has been at a premium and it has become necessary to drain and reclaim swamps and marshes to fulfill the growing industrial and residential needs of the area.
“The parcel of land expropriated by appellant consists of a strip 300 feet in width and several thousand feet in length running in an easterly-westerly direction and comprising a portion of a tract containing 610 acres fronting on old U. S. Highway 90. The entire 610 acre tract owned by defendant is known as Bayou Vista. More than one half of Bayou Vista, namely, the northern portion thereof, was developed by defendant into Bayou Vista Subdivision, a residential subdivision, prior to institution of the present suit. The strip expropriated by plaintiff is situated on the southern portion of the undeveloped area to the south of Bayou Vista Subdivision and is bounded on the south by the Southern Pacific Railroad right-of-way except on the east end where the expropriated right-of-way turns northerly. It is conceded that the acreage taken is comprised of two areas of slightly different character which were considered separately for purposes of valuation by the expert witnesses who appeared on behalf of the litigants. The western 9.642 acres of the expropriated strip (referred to by the appraisers and hereinafter sometimes designated by the court as ‘the 10 acre tract’) was cleared land in cultivation in that defendant was utilizing same for the growing of sugar cane. The remaining 38.826 acres (hereinafter sometimes referred to as the ‘38 acre tract’) was wooded. Subject property is shown to be located a distance ranging from 366 feet to approximately 2000 feet south of that portion of Bayou Vista actually subdivided and developed by defendant prior to plaintiff’s filing the present action.
“The record reveals that several years prior to commencement of this expropriation proceeding, defendant commenced development of Bayou Vista as a residential subdivision. Commencing at the northern portion of the 610 acre tract fronting on old U. S. Highway 90, defendant began clearing the land and subdividing portions thereof into residential building plots. Notwithstanding the relatively high elevation of defendant’s land situated on Teche Ridge, it was necessary to install drainage facilities to convert the land into use for residential subdivision purposes. In this regard, the evidence is uncontradicted to the effect that drainage is a problem in this entire area due to proximity to the gulf and the relatively low and flat character of land in’the general vicinity. To render Bayou Vista suitable for residential subdivision purposes, defendant constructed an elaborate system of canals and levees surrounding the entire 610 acre tract to both drain Bayou Vista from waters within as well as prevent the flow of water onto defendant’s said land *159 from adjoining properties. In addition to the system of canals and levees (which involved an expenditure of several thousand dollars) defendant constructed a pumping station adjacent to the railroad which bounds Bayou Vista on the south. The record shows that the aforesaid pumping station, consisting of three pumps having a discharge capacity of 30,000 gallons per minute each, was installed at a cost to defendant of more than $68,000.00 and was considered more than adequate to drain the entire 610 acres. It is likewise undisputed that defendant was in the process of selling the entire 610 acre tract by continuously subdividing additional portions into residential homesites by clearing the land, constructing streets and installing utilities.”
To support his claim to the additional sum demanded the defendant offered the testimony of five highly qualified appraisers, including himself, who gave the following evaluations (generally in round figures): (1) Ned Russo, $60,500; (2) John Kyle, Jr., $87,200; (3) Michel Hebert, $93,300 (his stated total appraisal was $70,800, but our recomputation of his figures reveals an arithmetical error which, when corrected, makes his net appraisal as shown); (4) Edward Rapier, the defendant, $106,400; and (5) Stanley Lemarie, $77,646 (Lemarie also made an arithmetical error in his calculations so that, after the correction, the appraisal by him is as here shown.
The defendant additionally offered the testimony of Theodore F. Kramer, an expert who for years has operated an independent engineering firm, has had extensive experience in the area, and who, prior to the instant taking, had planned and supervised the construction and installation of a complete canal and pumping system which adequately drained the entire Lagonda 610 acres, including the strip in question.
In rebuttal, the plaintiff introduced the testimony of (1) J. L. Blouin, one of the original appraisers in the expropriation proceedings, who estimated the value of the acreage taken at $11,000, and (2) Arthur Fleming whose appraisal was $10,000. Also, it was stipulated that Lee C. Firmin, a state senator and one of the two original appraisers, had valued the property at $7,-144.11. (Firman was not called as a witness to explain the basis of his appraisal.)
The record in this case (as observed by the Court of Appeal) leaves no doubt as to the scarcity of property for both industrial and residential use in the Patterson-Berwick-Morgan City area, this due to an almost sky rocketing population and industrial growth, which began some years prior to the institution of this suit, and to the economic unfeasibility of reclamation of much of the terrain in such area. (This condition was also reflected in this court’s opinion in Domino v. Domino, 233 La. 1014, 99 So.2d 328 where the value of 153 acres of land, situated in St. Mary Parish near Morgan City and the worth of which we fixed at $1234 per acre, had to be determined in *161 passing upon a question of lesion.) All of the experts testifying herein, including those for plaintiff, spoke of the demand for usable property in the area in question; and both Blouin and Fleming stated that for this reason their appraisal of the 10 acre tract, which they valued at $1000 and $750 per acre, respectively, was based on the consideration that its highest and best use was for residential subdivision development.
The main cause of the disparity in the total values as between those fixed by plaintiff’s and defendant’s witnesses was that Blouin and Fleming concluded erroneously (as will be hereinafter shown) that the land comprising the 38 acre strip (the eastern portion) could not be used for residential purposes, it being virtually worthless, overflowed marsh land. They said that it could not be economically reclaimed; and hence, they assigned to it a mere nominal value of only $35 per acre, this being based on expropriation awards for power and light and deep sea channel rights of way over marsh lands somewhere “on the other side of Houma” in Terrebonne Parish.
Blouin freely admitted that his appraisal of the 38 acres would have been much higher if the land could be well drained and economically recoverable; that “it would have the same value” as the 10 acre tract if it were in the same physical condition. Likewise, Fleming stated quite frankly that “if it (the 38 acre tract) was free from the problems of water, it would be quite comparable to the higher land”; and that “if it was high and dry, well drained and the trees and so forth removed, and you had your streets installed and all your sewerage and water and so forth, I would say it would compare very comparable, perhaps even better because of the trees.”
While Fleming testified that he saw water standing on the 38 acre tract, which led him to conclude that it was worthless marsh, he admitted that he did not view the entire strip, had not walked on any part of it to determine the depth of the water (he walked an indeterminate distance along the railroad tracks), and did not know whether it was above or below sea level (the record conclusively shows that the ground elevation of this tract is approximately plus two' mean sea level). Likewise, Blouin, although he viewed the tract from the railroad tracks from where he saw water “all along the track” and concluded that the property was worthless marsh, did not go on the land to determine the depth of the water or the nature of the terrain. Moreover, it is clear from Blouin’s testimony that the water he referred to principally was in a canal which drained the property, he not being aware at the time of a canal’s existence along the railroad tracks. Too, neither of those witnesses knew of a drainage system affecting the property. Blouin saw a pumping station in the vicinity, but did not know that it drained the lands in question ; and Fleming did not even see that station, although it was located within easy view of the tracks on which he walked.
*163 On the other hand the testimony of Kramer is convincing that the entire 610 acres (including all of the land involved herein) was within a well organized secondary levee, canal, and pumping system, commenced in 1955 and completed about the latter part of 1958 for which Lagonda had paid in excess of $68,000. His testimony that on November 17, 1959 (when this suit was filed) both the 10 and 38 acre tracts were ready for residential development (with the exception of some lateral ditches or drains which would be provided with the installation of streets), and were some of the best drained properties in the area, was amply corroborated by Rapier and Kyle, the latter having had the land inspected by two of his associates who are graduate engineers. (It also appears from testimony and pictures that, shortly after the present expropriation, there was cleared an area containing about 15 wooded acres located immediately adjacent to the 38 acres here taken, and it proved to be perfectly satisfactory for residential purposes.)
Under the aforementioned circumstances we cannot give any weight to the opinions of value offered by the plaintiff’s witnesses regarding the 38 acre tract. However, their statements with reference to the value of the 10 acres for additional development does have, as hereinabove shown, some relevancy to the worth of the larger tract.
At this time we mention that Lemarie was of the opinion that the 10 acre tract had a value for light industrial or commercial use (besides for its residential adaptability), this because of its being bounded on the west by a spur track and in close proximity to already industrially developed property. For this reason he appraised such piece at a value higher than if it had been considered for only residential use. However, while one or two of the other witnesses said that it could be so used, none ascribed to such smaller tract any special or additional figure for industrial purposes. In fact, there is testimony to the effect and if this tract were to be developed industrially or commercially it would adversely affect in some measure the value of a portion of the 38 acres for residential use. Taking all of this into consideration, we have determined that the highest and best use to which the entire acreage (48.468) could be put at the time of the expropriation was for a residential subdivision (this would reduce Lemarie’s total appraisal from $77,646 to $74,145.75).
We realize that there is a large divergence in the estimates regarding total value. But we believe that as among the defense witnesses this differential is due to honest disagreements in opinions, mainly brought about because there were but few, if any, comparable sales available. (A similar large divergence likewise existed in Domino v. Domino, supra, where the experts appraised 153 acres near Morgan City in St. Mary Parish at from $42,000 to $374,000;)
*165 Referring specifically and with more minuteness to the defendant’s evidence we find that, generally, all of his experts arrived at their total appraisal on a per acre basis. While we have considered the testimony of Rapier (the defendant himself) we, like the other two courts, feel that his appraisal of $106,400 is excessive, particularly because he failed to take into account certain deductions established by his own witnesses to be proper, and further because it is far greater than the value alleged in his answer.
Russo appraised the entire acreage as a whole, he assigning a value of $1250 per acre to it without any detailed basis therefor. He stated, however, that he considered his a very low appraisal.
Neither did Kyle detail his total appraisal of $87,200 ($1800 per acre). But, because of his lengthy experience in the area as a dealer in lumber, in oil services, and in construction and development operations, we have not discounted entirely his opinion; rather we have weighed it in considering the fairness of Lemarie’s appraisal which, we think, is the most detailed and well founded one and, therefore, should be adopted. (For instance, we note that commencing in 1955 Kyle very profitably developed a 40 acre tract located some four miles east of Bayou Vista on Highway 90 and “right outside the Town of Berwick” — some portions of which were one and one-half feet under water; and that he paid therefor $1500 per acre before it had been even leveed and pumped. Further, he said that for the past five years he and his associates have been looking for land to develop, and that they recently spent $4000 in topographical surveys, etc., in an effort to find salvagable land.)
Since there appeared to be no comparable bulk sales available Lemarie, as did Hebert and plaintiff’s appraisers, “worked backward” from lot sales in the vicinity, particularly from some of those in Bayou Vista subdivision. By averaging the lot sales of Lagonda in 1959, he concluded that developed land in Bayou Vista was worth $5323 per acre on a lot basis. We do not find this figure excessive, although it does exceed Hebert’s “estimate” of $3795, since it is based on actual sales. Also, it is less than the estimated retail lot value assigned by Fleming and Blouin at $5600 and $6100 per acre, respectively.
From the gross amount fixed by him ($5323) Lemarie made the following deductions in order to determine the value of the raw acreage of the 38 acre tract: 20% for streets (which approximates Blouin’s figure for this purpose) ; 25% for difference between bulk and retail lot sales (he testified that the usual figure is 20-30%, and that he used the median percentage); $550 for cleaning and grubbing; and $1000 for development costs — furnishing streets, water and some lateral ditches, etc. These deductions total $3945; and they result in a *167 $1378 per acre value for the 38 acre strip, or a total of $53,502.22.
While the development costs in the nearby Bayou Vista subdivision was proven to be only $787 per acre, and although this would be a fair deduction for the already cleared and usable 10 acre tract, it was shown that this item would run slightly higher for the 38 acre tract due to the fact that it was wooded and also required some ditching; consequently, this cost was fixed at $1000. The $550 per acre expense for cleaning and grubbing was established from actual cost figures involved in the same operation on a similar strip immediately adjacent to that expropriated.
Lemarie did not fix a residential value on the 10 acre cleared tract (because he had appraised it as commercial or light industrial, as aforesaid), but it is readily determinable on the same basis as the 38 acre tract by eliminating from the deductions the $550 per acre item for cleaning and grubbing and by charging only $787 instead of $1000 per acre for developmental costs. Such calculation results in a net raw acreage value of $2141 per acre for the 10 acre tract, or a total of $20,643.52.
We have accepted the figures of Lemarie as being proper deductions, because they are based on actual experiences on nearby properties. On the other hand plaintiff’s experts, although fixing a higher retail lot value as to the 10 acres, came out with a lower raw acreage value on that smaller tract ($1000 for Blouin, $750 for Fleming) by and through the use of unsubstantiated costs. Thus, Blouin’s conclusion was explained merely by his statement that the cost would reduce the value to $1000 per acre. Later he said that he had not inquired into the expense at Bayou Vista or elsewhere in the vicinity but that he had based his estimate on the front foot cost of an unspecified subdivision developed by him in Lafourche Parish. Fleming merely stated that, with $5600 per acre as the lot value, the ratio of raw land to finished retail lots would be 6 or 7 to 1. He further said with reference to his method of deductions, however, that “Very often it’s a rule of thumb. It’s not the way we appraise property but * * * entirely, I mean, there are many other considerations but it’s a rule of thumb that very often comes out that way. I could cite you a number of cases.” However, he took into account no other considerations and cited no cases. We find these explanations of Blouin and Fleming, therefore, very unsatisfactory and entirely unacceptable.
Hebert gave a retail lot value lower than that furnished by some of defendant’s other experts. But he reached, as we have shown heretofore, a much higher raw acreage value on both tracts of land — $93,300. However, it appears that he failed to take into account any deduction for the consideration that this was a bulk sale (as did Le *169 marie). If we apply to his appraisal the .25% deduction for the purpose the net value would be $69,975.
Considering Lemarie’s appraisal as shown in detail, the unrebutted basis for his figures, and the accepted estimates of other •experts produced by defendant — they range from $60,500 (Russo) to $87,200 (Kyle)— we think that it is not out of line and that it ($77,646 less $3,500.25, the latter amount being the difference between industrial and residential values on the 10 acres) represents the true market value of the property expropriated. Accordingly, we conclude that the defendant has discharged his bur■den of showing that the entire acreage (48.468 acres) was adaptable for at least residential use when taken and was well worth the sum of $74,145.75.
For the reasons assigned the judgment of the Court of Appeal is amended by reducing the amount awarded defendant from $79,099.80 to $74,145.75, subject to or less the deposit of $11,000; and, as thus .amended, it is affirmed. The defendant •shall pay the costs of this court. All other •costs arc assessed against plaintiff.
FOURNET, C. J., dissents and will assign written reasons.
HAWTHORNE, J., dissents being of the view that the amount awarded for the prop■erty is excessive.