183 So.2d 111 (1965)
CENTRAL LOUISIANA ELECTRIC COMPANY, Inc.
v.
Charles E. DUNBAR, III.
No. 6514.
Court of Appeal of Louisiana, First Circuit.
December 21, 1965.
Rehearing Denied January 24, 1966.
*112 Jack M. Gordon, of Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, for appellant.
D. J. Barranger, of Barranger, Barranger & Jones, Covington, Landry, Watkins, Cousin & Bonin, New Iberia, for appellee.
*113 Before ELLIS, LOTTINGER, LANDRY, REID and BAILES, JJ.
LANDRY, Judge.
Defendant property owner has taken this appeal from a judgment of expropriation in favor of plaintiff, alleging dual error on the part of the trial court in awarding inadequate compensation for the land actually taken by the expropriating authority, and failing to allow severance damages for the reputed diminution in value of appellant's remaining property. Plaintiff-expropriator has answered defendant's appeal contending the lower court erred in fixing the value of the land taken and mistakenly holding the best and highest use of appellant's property was for subdivision purposes.
Subject property consists of 160 acres described as the NE¼ of the NE¼, SE¼ of NE¼, SW¼ of NE¼ and NW¼ of SE¼ of Section 17, Township 7 South, Range 14 East, St. Tammany Parish. Section 17 being a regular section, the foregoing description adequately portrays the shape of the property insofar as visualization of form is necessary or desirable.
The servitude sought to be expropriated is eighty feet in width and encompasses an area of slightly less than five acres of defendant's land. Plaintiff seeks the aforesaid right-of-way for the purpose of constructing thereon a high voltage electric transmission line. Although appellee's petition and the testimony of plaintiff's witnesses is to the effect that only a one pole line is contemplated, nevertheless, the servitude prayed for and granted by the trial court includes the right on the part of appellee to construct and install as many wires, poles, cables and other appurtenances as may be necessary or convenient for the transmission of electrical energy. The record does not show precisely how many poles and wires will be erected on defendant's property. It does appear that the servitude also embraces the right of ingress and egress to the 80 foot right-of-way for the purposes of constructing, maintaining and repairing the transmission line. In addition, plaintiff is accorded the right to remove, trim or prevent the growth of any trees, limbs or other plant life which, in plaintiff's judgment, might interfere with or constitute a hazard to the operation of the line. Otherwise, full and complete use of the land over which the servitude is granted is reserved to the landowner.
The right-of-way in question traverses appellant's property in a northwesterly-southeasterly direction at an approximate 40 degree angle, entering at approximately the mid-point of the western boundary of the NE¼ of the NE¼ of the section and exiting at about the midpoint of the eastern boundary of the SE¼ of the NE¼ of said section. In general, the servitude follows an old abandoned railway bed, referred to as a tram road, which has an elevation of approximately one foot above the natural level of the surrounding land. The eighty acres forming the NE and SE quarters of the NE quarter of the section, is well drained by a large drainage ditch which traverses these 80 acres from north to south and also by a small ditch situated in the southeast corner of the SE¼ of the SE¼ of the section, said latter ditch extending from the larger ditch easterly to the east section line. The property is mostly woodland, approximately 65 per cent thereof being in hardwood (mostly gum) and the remainder pine.
The learned trial court found the best and highest use of the property to be for subdivision purposes. He concluded the present market value for such use to be $400.00 per acre and, on this basis, awarded appellant the sum of $2,000.00 for five acres taken. Our esteemed brother below also held defendant-owner failed to establish the severance damages claimed.
It is undisputed that subject property lies within the vicinity of Slidell, Louisiana, being situated approximately 10 miles from that municipality. It is also conceded there is presently no road leading to defendant's land. The record reveals that the Slidell-Bogalusa *114 Highway, a hard-surfaced (blacktop) road, designated as State Highway 41, passes within one-half mile of the northeast corner of defendant's property. A gravel road connecting with said State Highway 41 parallels the east line of subject property one-quarter mile to the east thereof. State Highway 36, known as the Hickory-Abita Springs road (a blacktop thoroughfare) is situated one and a quarter miles south of appellant's lands. A gravel road connecting Florenville on State Highway 36 directly with State Highway 41 runs one-quarter mile northwest of appellant's lands. Abutting the eastern boundary of subject property are a number of 10-acre and 20-acre farms which front on the above mentioned gravel road granting access to State Highway 41.
According to testimony of record, defendant's property is one of several tracts acquired in 1961 and 1962 by defendant, and certain corporations controlled by defendant's brother, in a "package deal", from several Hauser heirs, for the price of $150.00 an acre. One of said tracts, containing 160 acres, abuts appellant's property on the west and is itself traversed by the gravel road connecting Highway 41 with Highway 36 at Florenville. Another of said tracts, also comprising 160 acres, lying one-half mile south of defendant's property, has already been subdivided and approximately fifty per cent of the lots therein have been sold. Still another parcel, containing 55 acres, situated a quarter of a mile north of defendant's tract and also traversed by the aforesaid Florenville gravel road, was in the process of development at the time of trial. A map and subdivision layout of still another 160 acre tract, abutting defendant's lands on the west, have received preliminary approval of the Parish Police Jury and were in the hands of a developer for a period of approximately nine months prior to trial date.
Defendant's contention, precisely put, is that the land in question is suitable for subdivision into four and five acre rural, wooded subdivision plots, referred to locally as "farms". In this connection, the record discloses that defendant's brother, George B. Dunbar, a developer who has created several rural subdivisions of the type mentioned, had found a ready market for small four and five acre tracts desired by certain types of individuals variously for homesites, "farm" and "week end homes." Moreover, appellant's expert appraiser, Emory L. Graves, testified there was indeed a market for such subdivision plots in the reasonably near future as witnessed by the fact that several such subdivisions had recently been successfully undertaken in the vicinity.
Upon being interrogated concerning his plans for subject property, defendant testified as follows:
"I will tell you the precise situation. When my brother and I bought this property, he told me that he was going to divide the piece directly adjacent to my property and also the other pieces that he bought. I told him that when that was finished that I would consider allowing him to subdivide my piece. I might subdivide it myself, that if in the interim admittedly I could sell it at a profit, I would do that. There was no definite plans but I just realized that, if he was going to subdivide the piece directly adjacent, that my land, in my opinion at least, would have value as subdivision land and would be a lot more valuable than it was previously and that's why I bought it and my plans are still the same today."
Conversely, plaintiff's witnesses considered the best and highest use of the property as the growing of timber while holding for "speculative enhancement in value." In this regard plaintiff maintains the hereinabove cited testimony of defendant, (and other statements appearing of record), indicate appellant had very little knowledge of the value of his own property and, in advocating its best and highest use as subdivision purposes, was relying upon the opinion of others in contending the best and *115 highest use was for subdivision into four and five acre plots. In addition, plaintiff makes much of the fact that defendant is not personally committed to subdivide the property himself.
Plaintiff's expert, Henry Breeding, Jr., testified that in his opinion the highest and best use was for the growing of timber. He did not consider the property suitable for subdivision purposes at any time in the foreseeable future. Mr. Breeding acknowledged the rapid growth of the area in general but expressed the view subject property could not be developed within the reasonably near future because of the present availability of more suitable subdivision sites.
Plaintiff's other expert, Max J. Derbes, in substance, agreed with the views expressed by Mr. Breeding. We note, however, that Mr. Derbes appraised the servitude on 3.25 acres at 90 per cent of the fee value and on 1.75 acres at 50 per cent of fee value on the grounds that since timber could no longer be grown on the servitude, the owner was deprived of 90 per cent of its best and highest use. As to the 1.75 acres mentioned, he believed the owner was deprived of only 50 per cent of its use for the following reasons:
"* * * The parish is growing. The area is growing. The land will be good for these other purposes, subdivision later or some other use. When this happens, the land within the right of way can be, as has been done in thousands of instances to my knowledge, this land can be incorporated into the land uses, such as the backend of the lots or acreage plots, boulevards. * * *"
The foregoing testimony indicates Mr. Derbes apparently considered that at least a portion of subject property was suitable for subdivision purposes, but that he did not consider the prospect of such development in the reasonably near future.
We are quite impressed by the testimony of defendant's witness Graves to the effect the property is suitable for the type of subdivision hereinabove mentioned. Mr. Graves' qualifications and years of experience in the real estate business in and around Slidell indicate he possesses a thorough knowledge and grasp of conditions and circumstances affecting the local market. He was thoroughly familiar with various local properties in general and subject property in particular. He had personally developed several subdivisions of the type contemplated by defendant's brother, George B. Dunbar, and gave most persuasive reasons why he considered defendant's property suitable for subdivision into plots of the character previously indicated.
It is well settled in our jurisprudence that expropriated property must be valued on the basis of its highest present day or foreseeable future use and the most profitable use to which land can be put in the foreseeable future, by reason of its location and adaptability, is the proper criteria for its valuation. City of Shreveport v. Abe Meyer Corp., 219 La. 128, 52 So.2d 445; Louisiana Power and Light Company v. De Bouchel, La.App., 143 So.2d 270.
If potential future use of expropriated property for residential or subdivision purposes can be shown within the reasonably near future, the owner is entitled to compensation on the basis of such use, notwithstanding the property is not being utilized for such use at the time of taking. State Through Dept. of Highways v. Rapier, La. App., 152 So.2d 272, writ granted, 244 La. 674, 153 So.2d 885, judgment amended, 246 La. 150, 164 So.2d 280; Central Louisiana Electric Co. v. Harang, La.App., 131 So.2d 398.
In the Harang case, supra, we held that where a potential use "is so indefinite or remote as to be predicated solely upon speculation and conjecture", it may not serve as the criterion of market value. In the instant case we are convinced, as was our learned brother below, defendant has established that the development of his property for subdivision purposes of the *116 kind shown will occur within the reasonably near future and that such type of development is the highest and best use to which the land can be put. We also concur in the conclusions of the learned trial judge to the effect subject property lies in close proximity to property which either has been or is about to be subdivided; that it adjoins a parcel of ground on which preliminary work leading to subdivision is presently in progress; that the defendant himself has contemplated subdivision of his lands, and that the prospect of such development in the reasonably near future is not so remote or indefinite as to be speculative or conjectural.
In determining the value of the property as being best suitable for the growing of timber, plaintiff's expert, Breeding, used several comparables. He first considered a sale dated October, 1963, of 39.33 acres of land situated about one and one quarter miles northwest of defendant's property. The price of $11,500 represented a value of $292.39 per acre. There was road access to and some improvements on the land. Without the improvements, Breeding considered the land worth $212.00 an acre.
Next, Mr. Breeding considered a sale in June, 1963, of 40 acres situated approximately three-quarters of a mile from subject property. The recited consideration established a per acre value of $120.00. The property was without access to any existing road.
Also considered by Mr. Breeding was a transaction executed in May, 1963, encompassing a 12 acre farm tract which abuts the east line of defendant's property and fronts on the hereinabove mentioned gravel road connecting with Highway 41. The sum paid for this tract amounted to $400.00 an acre.
Finally, Mr. Breeding considered the sales from the Hauser heirs, including the subject property, all of which sold for the sum of $150.00 per acre. He ignored, however, the subsequent development of these tracts and the use to which they were put following their acquisition by their present owners as herein previously noted.
Mr. Max J. Derbes, testifying on behalf of appellee, used the same comparables employed by Mr. Breeding, together with a sale on June 5, 1962, embracing a tract of 54 acres traversed by a road, for $225.00 per acre.
Mr. Derbes valued the servitude at $600.00 and Mr. Breeding attributed it a worth of $800.00.
In determining the market value of the property in question, defendant's appraiser, Emory L. Graves, first used as a comparable the transfer of four and a half acres of unimproved property, situated about one and one-half miles southeast of defendant's land, which sold for the price of $775.00 per acre. Also considered by Mr. Graves was a sale dated December 27, 1963, of 10.45 acres, located on Highway 41 about two and one-half miles southeast of the subject property, which commanded the unit price of $600.00 an acre. In Graves' opinion, he found no true comparables of record. He also stated that while the comparables employed by plaintiff's witnesses were geographically nearer subject property, they were not suitable for subdivision into five acre tracts because their small size did not admit of their profitable subdivision into 5 acre tracts. He further stated that a 40-acre tract would yield only 8 lots in a subdivision of the type for which a market existed and readily conceded there was little demand in the area for small building plots and homesite lots of the nature and size usually found in urban areas.
Allowing for development cost of $100.00 per acre for the type of subdivision contemplated, Graves assigned subject property a net value of $450.00 per acre in its present condition. Graves' testimony appears well reasoned and grounded on sound principles. It is predicated upon a type of subdivision not considered by plaintiff's experts. We are convinced, as was our learned brother below, that defendant has established *117 a marketability of his property for subdivision purposes of the type indicated within the reasonably near future. The trial court awarded the sum of $400.00 per acre for the servitude expropriated. Under the circumstances shown, we consider it represents the market value of the rights acquired by plaintiff at the time of taking.
Regarding appellant's claim for severance damages, Mr. Graves presented a hypothetical subdivision of the east half of defendant's property into a number of sites and computed what he considered to be the diminished value of each plot because of the presence and proximity of appellee's power line. In this fashion, he determined severance damages to be $8,694.00.
Mr. George B. Dunbar, defendant's brother, who has had considerable experience in the development of rural subdivisions, opined that the additional cost of developing the property and resulting sales resistance arising from the presence of a high voltage power line would cause a diminution in value of the remaining property to the extent of $6,000.00. He did not further substantiate his opinion.
It is settled jurisprudence that in expropriation suits the measure of severance damages, when due, is the difference between the market value of the property for sale or rental purposes immediately preceding and immediately following the taking. American Tel. & Tel. Co. of Louisiana v. Maguire, 219 La. 740, 54 So.2d 4; Central La. El. Co. v. Covington & St. Tammany L. & I. Co., La.App., 131 So.2d 369.
Also appropos the issue of severance damages presently under consideration is the following language appearing in Central La. El. Co. v. Covington & St. Tammany L. & I. Co., supra:
"In expropriation proceedings severance damages may be awarded for depreciation of remaining property caused by hazardous conditions resulting from a utility placed on the expropriated property. Tennessee Gas Transmission Co. v. Primeaux, La.App., 100 So.2d 917. Even where no real danger exists compensation may be granted for the mere fear of danger to the extent such psychological deterrent to prospective purchasers reduces the market value of the property remaining. Texas Pipe Line Co. v. National Gasoline Co. of Louisiana, Inc., 203 La. 787, 14 So.2d 636; Texas Pipe Line Co. v. Barbe, [229 La. 191, 85 So.2d 260], supra.
However, severance damages cannot be presumed and unless the owner of the remaining property shows by competent evidence that the value of his remaining land has been diminished by the taking, compensation will be limited to the value of the land actually taken. 10 R.C.L., Eminent Domain, Page 135, Par. 154; Louisiana Highway Commission v. Ferguson, 176 La. 642, 146 So. 319; Central Louisiana Electric Co., Inc. v. Leonards et al., La.App., 65 So.2d 631."
The burden of proving alleged severance damages to the remainder of property involved in an expropriation proceeding rests upon the owner who must establish such damages with legal certainty by a preponderance of evidence. Central Louisiana Electric Co., Inc. v. Leonards et al., La.App., 65 So.2d 631; Texas Pipe Line Co. v. Barbe, 229 La. 191, 85 So.2d 260; Central La. El. Co. v. Covington & St. Tammany L. & I. Co., La.App., 131 So.2d 369.
We find, as did the learned trial judge, that defendant has failed to establish entitlement to severance damages herein. The testimony reveals that in other similar subdivisions in the general vicinity, development has not been retarded or impeded, sales have not been materially affected and values have suffered no diminution because of the proximity of electrical transmission lines.
Accordingly, the judgment of the trial court is affirmed at appellant's cost.
Affirmed.