ELLIS, Judge.
Plaintiff, under authority of R.S. 48:441 et seq., expropriated 5.577 acres of defendants’ property in the City of Baton Rouge for the purpose of constructing part of a controlled access highway which is now in use. Pursuant to statute, the Highway Department secured the services of two appraisers, Mr. John Lejeune and Mr. Le-Roy Cobb, who appraised the value of the land taken at $21,895.00 and the damage to the remainder of the land at $10,977.00. The sum of these two amounts was deposited with the court at the time the order of expropriation was signed.
As a result of the trial in the District Court, judgment was rendered fixing just compensation for the land taken at $45,-525.00 and fixing the severance damages to the remainder at $45,051.00. An additional $200.00 was allowed by the trial court to compensate for fencing and a temporary construction servitude. Plaintiff has appealed this verdict and the matter is now before this court for decision.
Prior to the taking defendant owned a rectangular piece of property running northeast and southwest, containing a total of about eighteen acres situated near the Perkins Road — Acadian Thruway intersection. Part of the land lies south of Dawson Creek which runs in a general east-west direction severing the subject property. The consensus of all the experts, however, is that the property south of Dawson Creek was not affected by the taking and it may be excluded from further consideration. The portion of defendants’ land north of the creek contains 13.73 acres. Access west to Acadian was obtained by purchase of a wedge-shaped piece of property on February 16, 1962.
On January 24, 1963, the plaintiff expropriated 4.999 acres of the rectangle running east-west, diagonally across the subject property. Also expropriated was a portion of the wedge which completely cut off access to Acadian. The total expropriated area is 5.577 acres. The defendants’ property was thus severed into two parts, 4.914 acres and a part of the wedge south of the new highway and 3.242 acres north of the new highway. The pieces have no access to Acadian and no access to each other. Ingress and egress to the remaining subject property is now had *575 through Valley Park and Valley Park Annex, two low economic adjacent subdivisions.
 In arriving at just compensation for the value of the land taken and the amount of severance damages to the part remaining, it is first necessary to consider the uses to which the land might reasonably have been put and to determine the highest and best use of the land. Then the highest and best use of the remainder after expropriation must be determined to arrive at the severance damages. Care must be exercised in this regard not to accept a mere speculative use. State Through Department of Highways v. Riley, La.App., 143 So.2d 396, Parish of Iberia v. Cook, 238 La. 697, 116 So.2d 491, State Through Dept. of Highways v. Rapier, 246 La. 150, 164 So.2d 280.
At the time of the expropriation the tract in question was being used as a boarding stable for horses. This enterprise was conducted for profit but was also in the nature of a hobby with the defendant. The property is, nevertheless, adjacent to Valley Park Subdivision and Valley Park Annex, both low economic residential developments. These subdivisions border the property on the north and east sides. On the western side of the property a wedge-shaped tract gave the defendant access to Acadian Thruway. There are a number of subdivisions within the immediate vicinity of the subject property and it is zoned 1-A, the top rated residential classification. Development of the subject property as a subdivision appears to be the highest and best use which could be made of it.
The real question arises, however, as to whether the property should be developed as a low economic or as an expensive subdivision, the greater value obviously being found in the latter.
The experts for the Department attempted to downgrade the property and relegate its use prior to the taking to a low economic subdivision, because its logical access prior to the acquisition of the access to Acadian Thruway was through Valley Park and Valley Park Annex, because of a drainage problem and because of a nearby railroad.
We shall consider those three objections in that order.
It is conceded by defendants’ experts that without access to Acadian the highest and best use of the property before the taking would have been for a low economic subdivision. This is clearly the best use that can be found for the remainder now that access to Acadian is impossible. The reason for this is that entrance to an expensive subdivision through a low economic area impairs the value of the subdivision and makes the success of the venture doubtful.
The Department contends that the access to Acadian Thruway was acquired by the defendant at a time when he knew that it would be expropriated and that, therefore, his acquisition should not be considered by this court in determining the value of the property. The evidence does not support the Department’s contention. It was disclosed that for many years the defendant had been attempting to purchase an access to Acadian Thruway but that the owner of the necessary property was not disposed to sell. Sometime before the final plans of the Expressway were made public defendant managed to purchase his access to Acadian Thruway from an estate and it was only thereafter that it became known that the access would be expropriated along with a portion of his land. Actual expropriation took place eleven months after the acquisition. Even if it were conclusively shown that the defendant had acquired the access with the knowledge that it would be expropriated at some future date, we do not believe that this court can entirely disregard the access to Acadian in arriving at the highest and best use o.f the property in view of the fact that defendant had sought the access for years before the new highway was considered. The fact that the acquisition of *576 the access was accomplished indicates that the property could have been developed as a first-class subdivision and, accordingly, the value of the land and severance damages must be computed on that basis unless other facts preclude such development.
Experts for the Department also attempted to downgrade the property on the basis that it had a serious drainage problem. Mr. Horton, a civil engineer, prepared surveys, drawings, and cost estimates for defendant as to the development of an expensive subdivision and these cost estimates were later used by the experts for the defendant in determining land values.
While it is true that these documents were prepared after it became known that the property was to be expropriated and with the knowledge that the subdivision could never materialize for that reason, the cost estimates and engineering data which stand almost uncontradicted establish the feasibility of the project. Mr. Horton did not consider the drainage problem serious. Mr. Jack Muse, chief hydraulic engineer for the City-Parish government of Baton Rouge, testified that the maximum flood stage of Dawson Creek was twenty-nine feet above sea level. Contour maps indicated that the elevation of the subject property was in the vicinity of thirty feet, or possibly that it had an average elevation of twenty-nine feet. Mr. Muse testified that “At rare, infrequent intervals I would think that you would ocasionally get water to a fairly shallow depth over this property.” However, the close proximity of Dawson Creek would facilitate the alleviation of the minor drainage problem. Mr. Muse felt that the situation could be eliminated and that it really constituted a very minor problem. The cost estimates indicated that the level of each lot could be raised sufficiently to eliminate any flooding problem at a cost of approximately $100.00.a lot. We are not convinced that the property is subject to flooding. There is no evidence of any kind to indicate that the property has ever flooded since Dawson Creek was improved several years ago.
The expert witnesses for the plaintiff gave great weight to the drainage problem in concluding that the highest use of the property before the taking was as a low economic subdivision. In view of the fact that the evidence fails to establish the existence of any such problem, we are justified, as was the trial court, in giving little weight to that testimony. The pres-sence of Dawson Creek actually minimizes the cost of providing for drainage.
The railroad lies south of Dawson Creek and south of the defendants’ property which was not affected by the taking. It is farther away than in Hundred Oaks Park Subdivision which is a first-class area. The evidence in this case is to the effect that while a railroad is not a desirable neighbor in an expensive subdivision, this railroad is a sufficient distance away to eliminate the problem. It certainly does not appear to have been a problem in Hundred Oaks Park.
For these reasons we find as did the trial judge that the highest and best use of the property prior to the taking was for an expensive, first-class subdivision and that the highest and best use of the remainder is for two low economic subdivisions.
Plaintiff complains that there was no showing made by defendant that he intended to use the land for that purpose or that the real estate market could absorb such a subdivision and that, therefore, the use as a subdivision of any sort was speculative.
We are in accord with the cases cited by the plaintiff to the effect that the highest and best use of land must be reasonable and not remote or speculative. Plaquemines Parish School Board v. Miller, 222 La. 584, 63 So.2d 6; State Through Department of Highways v. Boyer, La. App., 130 So.2d 738; Central Louisiana Electric Co., Inc. v. Burns, La.App., 131 So.2d 390; Central Louisiana Electric Co., Inc., v. Harang, La.App., 131 So.2d 398; *577 Central Louisiana Electric Co., Inc. v. Mire, La.App., 140 So.2d 467; Greater Baton Rouge Consolidated Sewer District v. Nelson, La.App., 144 So.2d 186.
We do not believe, however, that under the circumstances presented in this case the use of this land for subdivision purposes is speculative nor is this court inclined to place on the defendant in an expropriation proceeding the burden of proving that he could have sold lots in his proposed subdivision. It is enough to show that the topography, location, size and other factors make the property suitable for a subdivision and that the subdivision is, to use the language of the Harang case, “reasonably prospective, as distinguished from remotely prospective, so as to remove said potential use or classification from the realm of guesswork, speculation and conjecture.” Koerber v. City of New Orleans, 234 La. 433, 100 So.2d 461. Plaintiff’s own experts conceded that the best use of the land was for a subdivision.
We turn now to a consideration of the expert testimony. Mr. LeRoy Cobb, who testified as an expert witness for the plaintiff, believed that the best and highest use of the property was for a low economic subdivision. He was concerned about the severe drainage problem which, as we have already pointed out, was illusionary. Mr. Cobb used a number of comparable sales in arriving at his estimate. The first of these was from Pruyn Realty Co. to Bay-nard in June of 1960 for an indicated price of $6,030.00 per acre. That property had a frontage of 2143 feet on College Drive by a depth of 164 feet and could thus be subdivided on College Drive without any loss of property for streets. Considering that fact and the fact that the Baynard tract was fifteen feet higher than the subject tract, Mr. Cobb used it as a comparable which must be adjusted downward to arrive at a value for the subject property. The second comparable used by Mr. Cobb was from Gottlieb to East Baton Rouge Parish School Board. This property was on College Drive, also, contained 11.71 acres, and sold for an indicated acreage price of $7750.00. It has an elevation of approximately fifty feet. The third comparable considered by Mr. Cobb was from Bowlus to Cohn which sold for an indicated price of $2,419.00 per acre. That property is known as Plumbroque and has since been developed as a low economic subdivision. Another comparable was Bridge City Realty Company to Roman Catholic Church of the Diocese of Baton Rouge, a sale made in July of 1962, of property on Hundred Oaks and Acadian Thruway for an indicated per acre price of $8,818.00. The elevation of that tract was fifty-six feet. Mr. Cobb concluded, on the basis of these and other com-parables, that the value of the subject property was $4,000.00 per acre before the taking. Mr. Cobb testified, however, that he did not use any specific percentage adjustments but simply concluded that $4,-000.00 was a reasonable price per acre, considering all the comparables. The testimony of Mr. John Lejeune on both direct and cross-examination consisted of his statement that he heard Mr. Cobb’s testimony and that if asked the same questions his answers would be substantially identical.
We are not impressed with the testimony of Mr. Cobb in this instance for the reason that he was obviously laboring under an incorrect view of the drainage problem on the subject property.
Mr. Kermit Williams was called as an expert on behalf of the defendants. Mr. Williams established the value per acre of the land taken as $8,400.00. This was done on the basis of comparable sales by considering the price that defendant could have sold the acreage for to a willing sub-divider. On the basis of comparable lot sales in the area Mr. Williams determined that the forty lots in the proposed first-class subdivision would gross $224,000.00. From this amount was subtracted the cost of developing the subdivision as estimated by Mr. Horton ($48,040.00), commissions and miscellaneous sale expenses of eight percent ($17,900.00), and a thirty percent *578 developer’s profit which would he expected by the purchaser ($47,510.00). This would give a value to the 13.15 (actually it is 13.-73) acres of $110,550.00 and it was Mr. Williams’ opinion that the property could have been sold for that price for subdivision development. This gives a per acre indicated value of $8,400.00 which was confirmed’ by comparable sales of acreage in the vicinity. On this basis the value of the land actually taken would amount to $42,-000.00. The value of the remainder as a part of the whole after the taking was $68,-550.00 and the value of the remainder after the taking, considering its highest and best use to be for low economic subdivisions, was $13,065.00. This figure was arrived at following the same procedure for determining the value of the land before the taking. The difference between these two figures, $55,485.00, would represent the severance damages.
Mr. W. D. McCants used two different appraisal techniques, the first being identical to the approach used by Mr. Williams and the second using acreage sales in lieu of lots. In arriving at a value of the whole of $107,752.00 Mr. McCants used as a comparable, Stanford Place which is situated approximately nine-tenths of a mile north of the subject property and which has a narrow access into Stanford Avenue, an extension of Acadian Thruway. That property was acquired at an average per acre price of $7,550.00. Mr. McCants also considered the sales from Barber to the East Baton Rouge Parish School Board at an indicated per acre price of $7,800.00 and a sale from Bridge City Realty Company to the Roman Catholic Church for an indicated per acre price of $8,818.00. After making small adjustments for those three comparables Mr. McCants arrived at a figure of $8,163.00 per acre for the subject property, or a total for the 13.15 acres of $107,752.00. This would indicate the value of the land taken at $40,815.00 and the value of the remainder as part of the whole of $66,973.00.
In order to arrive at the value of the remainder after the taking, Mr. McCants used the same technique of comparable sales of acreage which was later developed into low economic subdivisions. On the basis of these comparable sales he arrived at a value of the remaining eight-plus acres across the taking of $21,502.00 or an indicated value of $2,637.00 per acre. The difference between the value of the remainder and part of the whole after the taking and the value of the remainder after the taking using this approach is $45,435.00. Following Mr. Williams’ technique Mr. McCants arrived at a value of the land of $40,000.00 and severance damages of $57,614.00.
Using these figures, the trial judge computed the market value of the property taken and severance damage as follows:

*579 We find no error in the above figures and, accordingly, the judgment of the trial court is affirmed.
Affirmed.