345 So.2d 106 (1977)
STATE of Louisiana Through DEPARTMENT OF HIGHWAYS
v.
L. B. PONDER, Jr.
No. 11183.
Court of Appeal of Louisiana, First Circuit.
March 21, 1977.
Rehearing Denied May 9, 1977.
Writ Refused June 10, 1977.
*107 William W. Irwin, Jr., (Trial Atty.), Jerry F. Davis, Johnie E. Branch, Jr., Bryan Miller, Baton Rouge, for Dept. of Highways, plaintiff appellant.
*108 J. Lynn Ponder and Frank Koles, L. B. Ponder, Jr., Amite, for L. B. Ponder, Jr., defendant appellee.
Before LANDRY, EDWARDS and COLE, JJ.
COLE, Judge.
Pursuant to the authority granted by La. R.S. 48:441, et seq., the Department of Highways instituted proceedings on November 27, 1963, to expropriate six parcels of land owned by L. B. Ponder, Jr., totalling 28.295 acres for use on the I-55 and Louisiana Highway 40 interchange near Independence in Tangipahoa Parish. The land expropriated came from an original 128-acre tract from which smaller parcels that totaled approximately 25 acres had previously been sold. After the taking, nine parcels remained which totalled approximately 74.7 acres.[1]
The plaintiff, Department of Highways, deposited the sum of $7,539 in the registry of the court for the property expropriated. The defendant-landowner withdrew the amount deposited and answered the plaintiff's petition of expropriation contesting the adequacy of the amount deposited by the plaintiff for the property taken, and for severance damages to the remainder. Originally, the defendant claimed that $1,000 per acre was just and adequate compensation for the part taken based on a highest and best use as residential and business sites. The trial of the matter was delayed for several years. In 1971, the defendant amended his answer to increase his demand for compensation for the part taken to $2,000 per acre based on an alleged highest and best use as sand and gravel-producing property.
The trial court in written reasons concluded that the highest and best use was as sand and gravel property and fixed the compensation for the part taken at $1,500 per acre, or $42,442.50. The trial judge also awarded $100 per acre as severance damages for the 74.7 acres, amounting to $7,470. From the total award of $49,912.50 the court deducted the $7,539 already deposited and withdrawn by the defendant. The plaintiff appeals from this judgment.
The initial issue in this appeal is the question of what is the market value of the land taken at the time of the taking. The resolution of this issue is dependent upon a proper determination of the highest and best use of the land taken.
Also at issue is the question of whether any damages were caused to the part remaining arising from the severance, and, if so, whether any special benefits inured to the remaining portion to offset any severance damages.

MARKET VALUE OF PART TAKEN
The landowner is entitled to "just and adequate compensation" for the expropriation of his land. Article 1, § 2, Louisiana Constitution (1921). The jurisprudence prevailing in this state is that such compensation is measured by the monetary equivalent of the property taken, or the market value. State, Department of Highways v. Crow, La., 286 So.2d 353 (1973).
Market value has been defined to mean ". . . the worth of the land considered in the light of its best and highest use, this being the most favorable employment to which the property is adaptable and may reasonably be put in the not too distant future." State, Department of Highways v. Rapier, 246 La. 150, 155, 164 So.2d 280, 282 (1964); Lafayette Airport Commission v. Roy, 265 So.2d 459 (La.App. 3rd Cir. 1972).
The use of the land considered in determining market value must be one which has a bearing on the market value at the time of the taking, in that it is one which would be considered by a willing *109 buyer as affecting the market value. Lafayette Airport Commission v. Roy, supra at 467.
Applying the above-mentioned principles, it is clear that the market value attributed to the property by the trial court is manifestly erroneous. The record fails to support the trial court's conclusion that the highest and best use of the subject property was for sand and gravel production. Additionally, there is no basis for a valuation of the property based on such a use.
The defendant-landowner presented the reports and testimony of three real estate appraisers, all of whom testified as to the market value of the land based upon a highest and best use as small acreage, rural residential or commercial sites. The trial court in written reasons stated that it was impressed that the defendant's appraisers were realistic. However, their testimony was disregarded in reaching a conclusion. Instead, the trial court arrived at a market value determination based on the use of the land for sand and gravel production.
To support his contention that the highest and best use of the land was for sand and gravel production, the defendant presented numerous witnesses and reports. The defendant hired Etco Engineers and Associates to perform soil borings to determine the amount of sand and gravel available on the subject property. Stafford Wallace, Etco's field supervisor, testified that he made only two sample borings on the property. However, Wallace was not a geologist and did not perform any of the tests on the samples collected.
William LeCorgne testified concerning the test results on the two boring samples. The samples indicated various amounts of sand and gravel at varying depths. The report did not give the total percentages of sand and gravel for the borings. For example, the first boring indicated that at a depth of from 18 to 20 feet there existed a stratum of white sand and pea gravel. At a depth of 20 to 35 feet the stratum contained 40 percent gravel and sand. Boring No. 2 contained 40 percent gravel of one-fourth inch and greater at a depth of 28 to 30 feet. These percentages did not cover the entire depth of the boring, but only covered the distances indicated.
LeCorgne admitted that he was not qualified to evaluate the test results in terms of the feasibility of operating a sand and gravel pit on the property. In fact, the defendant offered no witnesses who could testify as to the economic practicality of sand and gravel production on the property based on the test results of the Etco borings.
On the other hand, the Department of Highways conducted twenty-four test borings to evaluate the sand and gravel concentrations on the subject property. The Department's tests were conducted under the supervision of George Cramer, geologist for the Department of Highways, and the borings were drilled over the entire area in question. The test results demonstrated that the sand and gravel-bearing strata in the area were non-continuous. The borings further indicated that the largest concentration of gravel one-fourth inch and larger present in any of the borings was 26 percent. The largest concentration of gravel meeting the specification standards of the Manual of the Louisiana Department of Highways (three-eighth inches or larger) was 10 percent. In order to be used in State projects, gravel must meet these specifications.
Discrepancies between the Highway Department's report and the Etco report resulted for several reasons. First, the definition of "gravel" used by the two reports was different. The Etco report classified as gravel anything passing through a No. 10 screen, whereas the Highway Department considered anything between a No. 10 and a No. 4 screen to be coarse sand. The Highway Department considered gravel as anything passing through the No. 4 sieve (one-fourth inch or larger). Also specification (spec) gravel was considered as three-eighths inch or larger. The Etco report did not make a determination of the concentration of spec gravel on the property. Further, the Etco report evaluated the percentage of sand and gravel by each stratum alone, whereas the Department of Highways' *110 report evaluated the percentages by stratum, and then recalculated to determine the total percentages of each boring.
The only witness presented to analyze the feasibility of sand and gravel production in terms of the test results of either the Etco report or the Department of Highways' report was Robert Waldron, a witness for the plaintiff. Waldron, a consulting geologist with personal experience in the sand and gravel mining business, was present at the drilling of a number of the sample borings and made visual observations and notes. Waldron relied upon the test results of the Department of Highways' tests because he had more confidence in the technique used therein than in the Etco report for the following reasons: the equipment used, the number and depth of the borings made, and the more thorough classification of the samples obtained.
The uncontradicted testimony of Waldron indicates that a successful operation needs to produce approximately 30 percent of spec gravel (three-eighths inch or larger). According to Waldron, sand and gravel could not be economically mined on the subject property because of several factors including: the lack of a high market for sand in the area; the thickness of the clay overburden which averaged 14 feet on the tract and which must be removed before mining efficiently; the leanness of the gravel-bearing strata; and the high cost of equipment required to mine the subject property. Consequently, Waldron concluded that a prudent operator would not lease the property for mining purposes.
The defendant contends that the Etco report demonstrates a sufficient percentage of gravel to justify mining operations on the subject property. However, the Etco report did not even figure the percentage of three-eighths inch gravel needed to forecast the feasibility of production.
To support his contention that the land had a potential use as sand and gravel-mining property, the defendant offered the evidence that adjacent and nearby lands have operating gravel pits on them (referred to as the "Kinchen pit" and the "Siragusa pit"). The trial court relied heavily on the existence of these operations. It is noted that both the Kinchen and the Siragusa pits only came into existence in 1968 or 1969, well after the taking in 1963; and both operations functioned because of the special benefit of having had the overburden removed for use by the Highway Department as fill on road-building projects, thus saving these operations the expense of removing the clay overburden. Also, as discussed previously, the gravel-bearing strata in the area were non-continuous. At best these operations are of little probative value in determining the highest and best use of the subject property.
After erroneously determining that the best and highest use of the property taken was for sand and gravel, the trial court accorded the land a market value based on this use. However, the record is void of any valid evidence of market value based on its use for sand and gravel mining. The trial court in its written reasons stated that the defendant's witness, Fred Anderson, testified that the best use was for sand and gravel mining and placed a value on the property of $2,000 per acre. Yet, our review of the record reveals that Anderson had no knowledge of any exploratory work done on the subject property and stated that he would not rely on either test submitted in evidence. Furthermore, Anderson made no appraisal of the value of the property for sand and gravel purposes.
The trial court, in fact, did not base its award on the alleged appraisal of Anderson, but awarded $1,500 per acre for the property taken. There is no basis for this award in the record. The trial court bases this award on "testimony as to equal value, royalty valuation and the income approached method." The trial court cites State v. Crow, supra, to indicate that such a method of valuation is controlling. As discussed above, however, the record contains no evidence as to "equal valuation" of the land as sand and gravel property, nor does the record contain any evidence upon which to base market value under the capitalization of income method. Edward Smith, accountant *111 for the Kinchen mine, testified for the defendant as to the royalties produced by that gravel operation. However, no effort was made to relate this evidence to the subject tract's income-producing potential. Also, no evidence was introduced as to any past income produced by the property.
Having found that the record fails to support the best and highest use of the property for sand and gravel mining, it is necessary to determine the correct highest and best use. It is evident from the testimony of both real estate appraisers for the plaintiff and all three for the defendant that the actual best and highest use of the property was either for small rural home or commercial sites. However, a problem arises concerning the correct market value of the property taken because of the wide discrepancy in the appraisals submitted by the plaintiff's and defendant's appraisers.
Chester Driggers, one of the plaintiff's appraisers, presented a revised appraisal of $9,155 for the entire part taken. This amount results from varying per acre valuations of from $250 to $525 per acre for the portions of the part taken, because he considered them as separate real estate entities. To arrive at a market valuation, he used approximately fifty comparable sales from the surrounding area, with special attention to sales up and down Louisiana Highway 40. He properly disregarded the only three comparable sales used by the defendant's appraisers, because as a result of attempts to confirm the sales, he reached the conclusion that the sales were not "arm's length" or "market" transactions. Driggers adjusted the comparables used slightly to compensate for the time differential between the time of the sales and the date of the taking, because it was his opinion that land values in the area from 1958 to 1963 showed only a normal increase, not a "boom."
Max Derbes, appraiser for the Department of Highways, made a revised appraisal of $8,672 for the area taken. His result was also based on various values of from $300 to $600 per acre for portions of the part taken based on size and location. Derbes discounted the same comparables as Driggers, based on the lack of "open market" evidence. The sales from the subject property which Derbes made reference to included sales of from one to five-acre tracts at a value of from $200 to $250 per acre. Additionally, Derbes did not use as a comparable sale one omitted by Driggers. This was a sale of .459 acres at a unit value of $1,089 per acre from the subject tract to be used for a church. Derbes adjusted this amount based on his opinion that such a small parcel would sell at two or three times the amount of the larger tract.
All three appraisers presented by the defendant used basically the same three comparable sales from the defendant's tract. These sales included: (1) the sale of the plot for the church; (2) the sale of a five-acre tract at a unit value of $750 per acre (in spite of evidence that it contained improvements); and (3) the sale of a one-acre plot for an alleged but disputed price of $3,000 for use as a bar (in spite of indications that this purchase price included the building and the land). Kermit Williams appraised the property at $750 per acre. Curtis Book and Robert Spec McClendon appraised the property at $800 per acre.
Our review of the record indicates that the defendant's appraisers did not use valid comparables in making their appraisals. While we are impressed with the reason, logic and thoroughness of the plaintiff's appraisers, Chester Driggers and Max Derbes, we do not feel that they made adequate adjustment of the comparables used to compensate for the increased value caused by the time differential; nor do we feel that justification exists for giving the various portions of the subject property different market valuations. Accordingly, we find the market value of the part taken to be $500 per acre. The resulting award for the 28.295 acre tract is $14,147.50.

SEVERANCE DAMAGES
Under La.R.S. 48:453, prior to its recent amendment, the burden is upon the owner of land taken to prove severance *112 damages to the property remaining by showing that the value of the remaining land has been diminished by the taking. State, Department of Highways v. Thurman, 231 So.2d 692 (La.App. 1st Cir. 1970).
Severance damages are those damages done to the remaining property because of its severance from the expropriated portion. Hatcher v. Gulf States Utilities Company, 219 So.2d 208 (LaApp. 1st Cir. 1969).
Such damages are normally calculated by determining the difference between the market value of the remaining portion immediately before and immediately after the taking. State Through Department of Highways v. Hoyt, 284 So.2d 763 (1973); State, Department of Highways v. Nisbet Properties, Inc., 309 So.2d 398 (La.App. 2nd Cir. 1975).
Once severance damages have been proven the expropriating authority may offset these damages against any special benefits received by the property as a result of the taking. State, Department of Highways v. Crow, supra; State, Department of Highways v. Nisbet Properties, Inc., supra.
Here, the defendant has failed to prove that the remainders sustained any damage as a result of their severance from the part taken. Moreover, the plaintiff has carried its burden of proving that special benefits were received by the remainders which would more than offset any alleged damages.
The trial court's award of $100 per acre for each of the remaining 74.7 acre tracts is without basis in the record. Of the five appraisers appearing, only one testified that the remainders sustained severance damages. McCIendon's opinion was that the damages amounted to $200 per acre, not $100 per acre. On the other hand, the remaining four appraisers, including two of the defendant's own appraisers, testified that any damages to the remainders were more than offset by the special benefits accruing to the remaining portions. These benefits included the obvious special benefit of close proximity to an interstate highway interchange. Therefore, we find that the trial court's conclusion that the remaining property sustained severance damages of $100 per acre which were not offset by special benefits is manifestly erroneous.
The plaintiff contends that the trial court committed error in awarding excessive amounts for the defendant's expert witness fees. The fees which were fixed by the trial court were as follows:

Robert Spec McClendon $450.00
Curtis C. Book 650.00
Kermit Williams 650.00
Ed Smith 150.25
Fred Anderson 450.00
William LeCorgne 450.00

The fixing of expert witness fees is within the discretion of the trial court, and no change should be made unless we find an abuse of that discretion. Monroe Redevelopment Agency v. Merkel, 321 So.2d 429 (La.App. 2nd Cir. 1975); State, Department of Highways v. Beauregard Development Company, Inc., 279 So.2d 787 (La.App. 3rd Cir. 1973). After reviewing the record, we have determined that the trial court did not abuse its discretion in awarding expert witness fees.
For the foregoing reasons, the judgment of the trial court is amended to reduce the award to the defendant to the sum of $14,147.50, subject to the credit of $7,539 previously deposited. The net amount due defendant shall bear legal interest at the rate of 5 percent per annum from November 27, 1963, until paid. The costs of these proceedings are taxed to the defendant-appellee.
AMENDED, AND AS AMENDED, AFFIRMED.
NOTES
[1] The Department claims that it seized 28.295 acres from a total acreage of 85.843 acres, thus leaving remainders totalling 57.548. This discrepancy apparently results from the contention that portions of the western tract were unaffected by the seizure. This difference in total acreage before and total acreage remaining, however, has no effect on the outcome of this case.