443 So.2d 672 (1983)
STATE of Louisiana, Through the DEPARTMENT OF HIGHWAYS
v.
LULING INDUSTRIAL PARK, INC. and St. Charles Holding, Inc.
Nos. 5-61, 5-180.
Court of Appeal of Louisiana, Fifth Circuit.
November 17, 1983.
On Rehearing December 8, 1983.
*673 William W. Irwin, Jr., Robert L. Ledoux, Bryan Miller, Jessee S. Guillot, Baton Rouge, for plaintiff-appellee-appellant Louisiana Department of Transportation and Development.
Mack E. Barham, Ralph S. Hubbard III, Barham & Churchill, New Orleans, for defendant-appellant-appellee.
Ford T. Hardy, Jr., New Orleans, for appellant.
Before SAMUEL, BOWES, GAUDIN, GRISBAUM, JJ., and PEREZ, J. Ad Hoc.
GAUDIN, Judge.
On March 8, 1974, the State of Louisiana, through the Department of Highways, filed an expropriation suit against Luling Industrial Park, Inc., in connection with construction of a bridge across the Mississippi River near Luling, Louisiana. Accordingly, the State took immediate possession of 217.566 acres from a 1,856.5-acre tract called Ashton Plantation and deposited $823,833.00 into the registry of the Court.
The sum deposited included $765,689.00 for the property taken and $58,144.00 as severance damages to the remainder of the tract.
The public necessity and purpose of the expropriation were not questioned, nor was the amount paid for the land actually taken. However, the amount deposited for severance damages was challenged and this litigation ensued.
Following trial in the 29th Judicial District Court, severance damages in the amount of $570,714.14 were awarded to St. Charles Holding, Inc., Luling Industrial Park's successor in title.
*674 St. Charles Holding appealed, asking that the award for severance damages be increased. The State also appealed, contending (1) that St. Charles Holding is not the proper party defendant to receive severance damages and (2) that the award was excessive.
For reasons following, we hold that St. Charles Holding is the correct party defendant to receive severance damages; in fact, St. Charles Holding is now the only party defendant. We further find that the award was not legally sufficient, and we increase it to $3,954,582.00.

DEFENDANT'S TITLE CHAIN
In 1973, before the expropriation, Luling Industrial Park had mortgaged the subject property to the Great American Mortgage Investors, an out-of-state business trust.
Great American intervened in the expropriation proceeding because of its mortgage, which stated, in part:
"Mortgager hereby assigns to mortgagee any and all awards that may be given or made in any proceeding by any legally constituted authority to condemn the property herein mortgaged, or any part thereof, under power of eminent domain."
In a separate action, Great American filed for executory process, alleging default; and on July 30, 1975, the Sheriff of St. Charles Parish sold the property, along with all personal rights arising from the expropriation suit, to Great American.
The State then filed exceptions of no right or cause of action in the expropriation proceeding and also an objection to Great American's procedural capacity. The trial judge overruled these exceptions, noting that Great American:
"... did purchase the remainder of the mortgaged property at the foreclosure sale and is now certainly entitled to intervene and prosecute the action for adequate compensation for the property taken as well as for severance damage to the remainder of the properties."
On October 28, 1975, Great American Mortgage Investors changed its name to Great American Management and Investment. The company went into bankruptcy in 1979, and was judicially authorized to sell all of its assets, including the personal right to seek severance damages, to Great American Management and Investment, Inc., which in turn sold the property and accompanying rights to St. Charles Holding, N.V.
On May 26, 1980, by court order, St. Charles, N.V. was named sole defendant in place of Luling Industrial Park and Great American. St. Charles Holding, N.V. was later liquidated pursuant to Section 332 of the Internal Revenue Code, and all of its assets went to St. Charles Holding, Inc.
The State finds fault with this chain of title, particularly with the sheriff's sale to Great American Mortgage Investors. However, it is apparent that Luling Industrial Park did encumber its expropriation suit rights, and equally evident that the sheriff explicitly conveyed these personal rights to Great American. Thereafter, these rights were legally transmitted until eventually obtained by St. Charles Holding, Inc.
Documents in evidence clearly show that the personal right, title and interest to and in the expropriation suit was specifically conveyed at every transfer, including (1) the sheriff's sale, (2) the transfer from Great American Mortgage Investors to Great American Management and Investment, (3) the transfer from Great American Management and Investment to Great American Management and Investment, Inc., (4) the sale from Great American Management and Investment, Inc., to St. Charles Holding, N.V. and (5) the distribution from St. Charles Holding, N.V. to St. Charles Holding, Inc.
The right to demand a fair market value and severance damages in an expropriation suit remains with the owner of the property at the time of the taking unless there is a specific transfer or assignment of this personal right. While this right is *675 personal and does not follow the land, the right can be sold, assigned or otherwise encumbered. See Rogers v. La. Power & Light Co., 391 So.2d 30 (La.App. 3rd Cir. 1980), and cases cited therein.
On May 29, 1980, the trial judge signed an order allowing Luling Industrial Park's counsel to withdraw because, according to the Luling Industrial Park's motion, "... all of defendant's (Luling's) rights ... were sold at a sheriff's sale ... to Great American Mortgage Investors..."
Despite the May 29, 1980, motion and order, Luling Industrial Park filed a petition of intervention on March 23, 1981, a week before the trial was to start, alleging that it, not St. Charles Holding, Inc., was the proper party defendant. The trial judge dismissed the intervention, then proceeded to hear the case from March 31 to April 3, 1981. Judgment was rendered on July 24, 1981.

LULING'S APPEAL
Following the dismissal of its 11th hour intervention, Luling Industrial Park appealed to this Court. This appellant, however, voluntarily withdrew its appeal on March 17, 1983, stating in its motion that:
"(1) All of the right, title and interest of Luling in and to this suit was sold at a Sheriff's sale to Great American Mortgage Investors in proceedings styled `Great American Mortgage Investors v. Luling Industrial Park, Inc.,' No. 15,618 on the docket of the 29th Judicial District Court for the Parish of St. Charles (the `Foreclosure Suit'), said sale having taken place at public auction on July 30, 1975;
"(2) Luling received the notice required by law from the Sheriff for the Parish of St. Charles of the seizure of its personal right in and to this suit by the Sheriff for the Parish of St. Charles in the Foreclosure Suit;
"(3) Said seizure and subsequent sale at public auction of all of the Luling's right, title and interest in and to this suit was done with the express knowledge and consent of Luling in an effort to be relieved of as much of its debt to Great American Mortgage Investors as possible pursuant to the Sheriff's sale;
"(4) The entire indebtedness of Luling to Great American Mortgage Investors was not satisfied by the sum paid by the purchaser at the Sheriff's sale;
"(5) Stacey Moak of the law firm of Cicero & Moak, formerly counsel for Luling in this suit, withdrew as counsel of record on May 29, 1980 and in his Motion of Withdrawal stated that all of Luling's rights arising out of this suit were sold at a Sheriff's sale on July 30, 1975 to Great American Mortgage Investors, which admission was made with the express knowledge and consent of Luling and is a true and correct statement; and
"(6) Mover attempted to intervene in the court below, which intervention was denied by order of the trial judge, from which order mover appealed, and mover's dismissal shall not interfere with nor prejudice any other party to this suit, nor will it serve to delay the resolution of this suit."
This action was taken pursuant to a resolution of Luling Industrial Park's Board of Directors.
These assertions are not, of course, necessarily binding all or in part on the court, but they are final and conclusive with regard to Luling Industrial Park's right to proceed further in this litigation. Any party can abandon its appeal, and Luling Industrial Park has chosen to exercise this absolute procedural right.
St. Charles Holding's position is that if Luling Industrial Park had any claim for severance damages following the sheriff's sale and felt aggrieved, such alleged rights should have been enunciated in a suit to annul the sale. An action to nullify has to be instituted within two years if based on informalities or within five years if based on radical defects.[1]
*676 Further, defendant questions the State's standing to now collaterally or otherwise attack the sheriff's sale, considering the fact that Luling Industrial Park's opportunity to do so has prescribed and also the obvious procedural fact that Luling Industrial Park is no longer pursuing any course of action.
Notwithstanding the probable impropriety of such an attack by the State, we have no reason to pass on these matters as we find no legal imperfection in any of the transactions in the chain of title leading from Luling Industrial Park to St. Charles Holding, Inc.
We can understand the State's policy, as stated in its brief, of "... opposing execution of any judgment against it by a person not entitled to seek such judgment in the first place." In the instant case, however, the State did take 217.566 acres from a continuous estate, and St. Charles Holding, Inc. has emanated as the proper party defendant to receive severance damages.
We note that the voluminous record in this case contains numerous other motions, orders and judgments related to various procedural problems. None, however, relate significantly to the two primary issues:
(1) Is St. Charles Holding, Inc., the proper party defendant?
and
(2) Is the award for severance damages inadequate or excessive?
We have already addressed the first issue, and now move on to the second.

ASHTON PLANTATION
Prior to the expropriation, Ashton Plantation was a one-piece, 1856.5-acre tract with approximately 3,981 feet on the west descending bank of the Mississippi River. It was traversed by Louisiana Highway 18 and the T & P Railroad near the river and by Louisiana Highway 3127 on the opposite side.
After the State's taking, the property was split into eight distinct parcels. Various documents in evidence portray this division, as does the not-to-precise scale sketch annexed to this opinion. Actually, the attached drawing is a close facsimile of Exhibit "D" and shows the portion expropriated and remaining property carved into eight numbered sections. Exhibit "D" contains this numbering, and the various witnesses referred to the different parcels by these numerical designations.
There was considerable testimony relative to the highest and best use of Ashton Plantation both before and after the expropriation.
Among the State's witnesses was Captain Martin Gould, an experienced river pilot, who said that Ashton Plantation was not a favorable site for a boat dock because the deep water channel of the river was dangerously close to the bank and that docked vessels would be too near those passing by.
Pearl P. Burke, an engineering geologist and a long-time employee of the United States Army Corps of Engineers, disagreed with Captain Gould. She said that Ashton Plantation had been an excellent site for an industrial dock but added:
"... it is my opinion that the existence of the bridge reduces the use of this section as a dock site and I doubt that you would be able to get a permit for a deep draft vessel dock."
Douglas Burton, a consulting engineer and an expert in site selection, stated that before the expropriation the plantation was "... one of the prime sites along the Mississippi River for deep water heavy industrial development. It's greatest value by far would have been for refining in petrochemical. The length of the batture ... would have allowed for at least three dock berths, perhaps four, which would have supported in the neighborhood of a 500,000 barrel per day refinery with associated petrochemical facilities ..."
The bridge, Burton said, destroyed the site as a deep water port and for industrial use.
Regardless, we are not directly concerned with the before taking value. The *677 parties agreed that the property remaining after the taking had a fair market value of $5,699,112.00 prior to the expropriation. A stipulation to this effect was entered into.
Severance damages are the difference between the remaining property immediately before and immediately after the expropriation. The before and after test may be applied to segmented areas of the remainder and the several sums added to make up the total award. See Town of Rayville v. Thomason, 404 So.2d 1290 (La. App. 2nd Cir.1981), and authorities therein referred to.
Thus, in the instant case, the trial judge had but to determine the after taking fair market value of Ashton Plantation, i.e., the fair market value of its eight remaining parcels. Once this was decided, the court had only to subtract this sum from $5,699,122.00 to arrive at a severance damages award.
The fair market value is the worth of property considered in the light of its highest and best use, this being the most favorable employment to which the land is adaptable and may reasonably be put to use in the not too distant future. Reference State v. Rapier, 246 La. 150, 164 So.2d 280 (1964).

DISTRICT COURT TRIAL
The State called seven witnesses, including Captain Gould; five Department of Transportation representatives; and Max J. Derbes Jr., a realtor and appraiser. The State attempted to show, primarily through the testimony of Mr. Derbes, that the property remaining after the taking was worth only slightly less than it was before the expropriation chiefly because the bridge and highway system made Moisant Airport and metropolitan New Orleans much more accessible. Mr. Derbes placed severance damages at just $55,117.00.
St. Charles Holding's four witnesses were Ms. Burke; Mr. Burton; Robert McSween, a real estate appraiser and consultant; and Roy M. Schwarz Jr., a realtor-appraiser and defendant's main expert.
Through these witnesses, St. Charles Holding tried to prove (1) that Ashton Plantation no longer had potential as a deep water port and had only a limited value with regard to the docking of barges, (2) that the highest and best use of the property varied from parcel to parcel and (3) that the remaining land was worth $1,500,000.00 after the expropriation, thereby setting severance damages at $4,199,122.00 ($5,699,122.00 minus $1,500,000.00).
After hearing the case, the trial judge totally rejected Mr. Derbes' contention that severance damages were minimal noting in the assigned reasons for judgment that Mr. Derbes' comparables were "faulty" and that Mr. Derbes "... refused to accept the fact that one whole tract of land divided into non-contiguous parcels is damaged."
The comparable sales referred to by Mr. Derbes were from a residential development on the other side of the river.
The trial judge was not too impressed by Mr. Schwarz's comparables, either, but he (the trial judge) did conclude:
"The record and exhibits and the evidence strongly support the fact of severance damages: Limited access from parcel to parcel; limited access from parcels to public roads; the non-contiguous nature and conformation of the remaining parcels; proximity of the bridge and right-of-way as a source of disturbance and annoyance; the non-access nature of the right-of-way creating a barrier between the remaining parcels; the limited use of the batture."
The record amply supports these factual conclusions and the ascertainment that more than just minimal severance damages are due, and we will not disturb these findings. See Canter v. Koehring Co., 283 So.2d 716 (La.1973), and Arceneaux v. Domingue, et al., 365 So.2d 1330 (La.1978).
We do, however, take exception with both the manner in which the trial judge computed severance damages and the figure he came up with. The trial judge said, *678 candidly, that he "... is hard pressed to determine the severance damage, realizing that the court should not substitute its opinion of severance for that of the experts."
Following his in toto rejection of the State's contentions and his determination that significant severance damages were rightfully owed, the trial judge applied this formula for arriving at the amount:
"... the expert Schwarz dwelled often on the figure of 10%, applying a 10% plus adjustment here and a 10% adjustment there. This court will apply a 10% severance damage to the remaining parcels of land; hence, 10% of the before taking figure of $3,482.26 per acre applied to the remaining 163819 acres gives a severance damage of $570,714.14."
Even if Mr. Schwarz repeatedly referred to "... a 10% adjustment here and a 10% adjustment there ...", he clearly did not mean this percentage figure to apply to severance damages. There is nothing in the record justifying an across-the-board 10 percent assessment regarding the eight incongruous parcels, nor is there any testimony suggesting that any percentage figure should be uniformly applied to the various segments.
While there is no exclusive or artificial formula for determining severance damages,[1] the district judge's severance damages award must be related to the adduced testimony and documentary evidence; and he must not substitute his opinion for that of experts.[2] Neither should he conjure up a percentage figure and apply it unalterably to dissimilar fragments, as was done here.
Every expropriation case is unique in some respects and must be judged on its own particular facts, and the ultimate test of value is what men of wisdom and prudence and having adequate means would devote to the parcels if owned by them. This canon is set forth in Parish of Iberia v. Cook, 238 La. 697, 116 So.2d 491 (1959), and in various subsequent cases, including Consolidated Sewerage District of the City of Kenner v. OKC Dredging, Inc., 380 So.2d 657 (La.App. 4th Cir.1980).
The most accurate and equitable method of establishing severance damages in the instant case is by examining each of the eight sections. The parcels are geographically different and obviously have varying after-taking values.
Before starting this inquiry, we note that the expropriation occurred in 1974 and the merits of this case were not heard until March and April, 1981. The record is devoid of any testimony concerning meaningful residential, industrial or commercial development on or immediately adjacent to the plantation from the time of the taking to the trial.

PARCELS 1 AND 2
These parcels, together, include 23.84 acres and form the riverfront. Mr. Schwarz testified that while these parcels "... lost most of their usage because of the loss of the deep water site ...", they nonetheless could be used "... for some kind of service on the river that utilized the river for dispatching..." And, he added, the site had limited value as a barge-docking site.
Mr. Schwarz placed an after-taking value of $36,000.00 on parcel 1 and a $73,000.00 value on parcel 2. We conclude that the highest and best use of parcels 1 and 2 and the after-taking values are in accord with Mr. Schwarz's testimony, noting, again, that the trial judge did not accept Mr. Derbes' conflicting overview.

PARCELS 3 AND 4
These parcels, too, are considered jointly due to their similarity. Parcel 3 has 14.37 acres while parcel 4 has 12.072 acres, and both are bounded by Highway 18 on the north side and by the railroad on the south.
The highest and best use for these parcels is light industrial or commercial, according to the testimony. The record supports *679 an after-taking value of $10,000.00 per acre or $143,700.00 for parcel 3 and $120,720.00 for parcel 4. We accept these figures.

PARCEL 5
This section is inappropriate for agriculture because the bridge blocks the sun and because its elongated shape makes it difficult to operate heavy equipment necessary for sugar cane.
Mr. Schwarz valued this tract at $600.00 an acre, and recommended selling it to the bordering landowner for $45,540.00. This appears to be the highest and best use.

PARCEL 6
This is the largest section, 1,214 acres, stretching from the railroad south to Highway 3127. At the time of the expropriation, approximately 612 acres were planted with sugar cane while the balance (602 acres) was wooded.
Mr. Schwarz said that highest and best use of the cultivated 612 acres was agricultural. He also stated:
"The highest and best use of the remaining acres was for hunting or some kind of recreation. It was low and got wet as you went progressively south."
After testifying at considerable length about the pros and cons of parcel 6 and quoting facts and figures from various comparable sales, Mr. Schwarz put the after-taking value at $913,000.00 ($612,000.00 for the planted portion and $301,000.00 for the wooded area).
In Mr. Derbes' opinion, the highest and best use of all of the plantation's remaining property, except parcel 8, was for industrial purposes if proper permits could be obtained. If permits could not be secured, Mr. Derbes added, then the highest and best use would be "... for future potential development on a speculative basis..."
However, there was no compelling testimony relating to parcel 6 usage other than for agriculture or hunting, and seven years had passed since the expropriation. If any industrial or commercial development was even planned, it was not brought to the trial judge's attention.
Mr. Derbes did not give an exact after-taking value for parcel 6 or any other individual section except parcel 7. His testimony, which the trial judge disregarded, was that parcel 7 was worth less after the taking but that all other segments, including parcel 6, were worth more.
Mr. Schwarz valued the cultivated portion of parcel 6 at $1,000.00 per acre and the remainder of this parcel at $500.00 per acre. Two comparable sales of wooded land similar to the rear portion of parcel 6, however, were for $750.00 and $1,250.00 per acre, respectively, the average being $1,000.00 per acre.
Taking into consideration all of the testimony and evidence regarding parcel 6, we conclude it has a value of $1,000.00 per acre, or $1,214,000.00.

PARCEL 7
All experts agree that these isolated 84.3 acres have lessened in value. The record supports an after-taking worth of $50,580.00 ($600.00 per acre).

PARCEL 8
This 203-acre tract is low and designated as wetlands but it does have limited access to Highway 3127. Mr. Schwarz, assigning a value of $61,000.00, said these acres are presently unusable; while Mr. Derbes testified that the highest and best use "... was potential future residential."
There was no testimony that this property was, in the foreseeable future, to be used for residential purposes. The evidence was to the contrary. There was little demand for residential property, and a governmental permit would be needed to drain the land.
There was nothing substantial to offset Mr. Schwarz's statements, and we accept them and his evaluation.

SUMMARY AND CONCLUSION
Recapitulating, the eight remaining sections of Ashton Plantation have a total *680 after-taking value of $1,744,540.00, itemized as follows:

 Parcel After-taking Value
 1 $ 36,000.00
 2 73,000.00
 3 143,700.00
 4 120,720.00
 5 45,540.00
 6 1,214,000.00
 7 50,580.00
 8 61,000.00

Subtracting $1,744,540.00 from $5,699,122.00, the agreed-to before-taking value of the eight parcels, the severance damages are $3,954,582.00.
The amount of severance damages may seem inordinate because the agreed-on before taking value was $5,669,122.00, and the State was saddled with this figure. However, we do not find fault with the before-taking price as it reflects the plantation's potential as a deep water industrial site, a potential ruined by the expropriation.
Likewise, we do not criticize Mr. Derbes' opinions. From the State's viewpoint and in an effort to minimize severance damages, he testified as best he could, considering pertinent facts and the lack of comparables favorable to the State's position.
Accordingly, the July 24, 1981, judgment of the 29th Judicial District Court is amended to increase severance damages to $3,954,582.00. In all other respects, the judgment is affirmed. Appellate costs are to be borne by the State of Louisiana, through the Department of Highways.
AMENDED AND AFFIRMED.
SAMUEL, J., dissents and assigns reasons.
*681 
*682 SAMUEL, Judge, dissenting.
Imprimis, I must mention that following our first hearing (before the original three judge panel) I wrote a proposed opinion and decree which annulled and set aside the judgments appealed from and remanded the matter to the trial court for a full hearing participated in by all three litigants, the State, Luling, and St. Charles. Despite the dismissal of Luling's appeal by Luling's counsel of record, a dismissal apparently final insofar as this court is concerned, I remain convinced that the annullment, the setting aside, and the remand are proper.
Because it is necessary to place the matter in proper prospective, and with an apology for the length of this dissent, the following is a somewhat shortened version of that proposed opinion with references to this writer alone rather than to a majority of the three judge panel.
"This matter, an expropriation suit, now involves three separate appeals, by the State, Luling Industrial Park, Inc., and St. Charles Holding, Inc., from different judgments in the same proceeding. The appeals were consolidated for argument for the purpose of convenience.
It is necessary to say the record lodged in this court is in extremely poor condition (a fact admitted by the attorneys in their briefs). This court is of course, entirely dependent upon, and restricted to, the record before it, and I have done the best I can with what we have.
In 1974 the State of Louisiana, Through the Department of Highways, filed this expropriation proceeding against Luling Industrial Park, Inc., then the owner of the property, under the quick taking statute to acquire a right of way for construction of a bridge across the Mississippi River and connecting roadways near Luling, Louisiana. The State immediately was granted 217.566 acres in fee simple, together with temporary construction servitudes on an additional 1.675 acres. The taking divided Luling's property into eight separate parcels.
Prior to the taking, on June 8, 1973, Luling borrowed money from Great American Mortgage Investors, a Massachusetts business trust, securing the loan by the pledge of a collateral mortgage note secured by a mortgage on the property in question. The genesis of one of the present disputes is paragraph seven of that collateral mortgage, which reads as follows:
"(7) MORTGAGOR hereby assigns to MORTGAGEE any and all awards that may be given or made in any proceedings by any legally constituted authority to condemn the property herein mortgaged, or any part thereof, under power of eminent domain, the amounts of such awards to be applied by MORTGAGEE to the reduction of the indebtedness hereby secured, and MORTGAGOR agrees to execute any and all such further instruments of assignment of any and all such condemnation awards, as may be required by MORTGAGEE to carry out the purposes of this paragaph. MORTGAGOR shall notify MORTGAGEE of any condemnation proceedings on the property hereinabove described within ten (10) days of its receipt of service of process arising out of said condemnation proceedings. MORTGAGEE retains its right to intervene in said condemnation proceedings, and MORTGAGOR agrees to pay MORTGAGEE'S attorneys' fees for intervening in said condemnation proceedings, and any amount so paid up to a total sum not to exceed one (1%) per cent of the original principal amount of the aforesaid note shall be secured by this mortgage." [Emphasis mine.]
On June 13, 1975, subsequent to the taking, Great American Mortgage Investors filed a petition of intervention in the expropriation suit seeking judgment in its favor and against the Department of Highways predicated on the above quoted paragraph seven of the collateral mortgage. In the intervention, Great American stated that "... under covenant (7), Luling Industrial Park, Inc. assigned to intervenor any and all awards that may be given or made in *683 any proceedings by any legally constituted authority to condemn the mortgaged property, or any part thereof, under power of eminent domain, with the requirement that the amounts received be applied by intervenor to the reduction of the indebtedness due it by Luling Industrial Park, Inc." In response to the intervention, the State of Louisiana filed exceptions attacking the trust's procedural capacity to intervene, the trust's right of action, and the trust's cause of action. The State's exceptions were overruled by the trial court.
On March 14, 1975, a few months prior to the trial court's decision on the State's exceptions, Great American Mortgage Investors filed an executory process proceeding by which it foreclosed on the remaining unexpropriated property. Great American prayed that a writ of seizure and sale issue ordering "... the Sheriff of this parish to seize and sell the above described mortgaged property for cash with appraisement...." (emphasis ours). The trial judge's order was in the standard form ordering that ".... a writ of seizure and sale issue herein as prayed for and according to law." (emphasis mine).
Great American caused a notice of seizure to be served upon Luling. The notice described the real estate subject to its mortgage and also contained the following paragraph:
"Including all rights appertaining thereto, and more specifically including all rights arising out of that certain expropriation suit styled "State of Louisiana Through the Department of Highways vs. Luling Industrial Park, Inc. No. 14633, 29th Judicial District Court, Parish of St. Charles, State of Louisiana."
The same language was contained in the sheriff's deed.[1] The petition for executory process alleged that the sum owed by Luling as $5,505,704.68, plus interest and attorney's fees. The price bid and "paid" by Great American at the sheriff's sale was $5,521,715, satisfying Luling's indebtedness to Great American.
In the expropriation suit, proceedings were conducted between the State and Great American (and entities claiming to hold under it) from Great American's intervention on June 13, 1975 until the filing of a petition of intervention by Luling Industrial Park, Inc. on March 23, 1981, seven days prior to trial.
Luling's intervention was necessitated, even though Luling was named original defendant in suit, by an ex parte motion filed by St. Charles Holding, N.V., claiming under Great American, to be substituted as sole defendant in place of Luling. This ex parte motion is the only document in the record removing Luling from the case as defendant. There is neither a contradictory motion filed against it, nor a judgment dismissing Luling from the case.
Luling asserted in its intervention the rule that a right of action for compensation and damages from expropriation of property does not pass to a subsequent purchaser unless there is an express transfer or subrogation of the right of action from the owner of the property at the time of expropriation to its successors in title.
The trial judge dismissed Luling's intervention at a pre trial conference. In addition to several substantive reasons for dismissal, he strongly implied the dismissal was based in part on the untimeliness of the intervention.
The record discloses untimeliness[2] is not a justifiable basis for dismissal of the intervention in this case. At the time, Luling had no attorney of record. Nine months previous to the intervention, Luling's attorney had withdrawn, and Luling was removed from the suit by the mentioned ex parte motion without the benefit of either notice or hearing. After its removal from the suit, the trial date was rescheduled on several separate occasions, and the clerk's certificate on each continuance only certified that attorneys of record were notified of the continuances. There is no indication *684 whatever in the record to indicate Luling was notified of any pending trial dates. Moreover, from the filing of the expropriation suit on March 8, 1974 until the dismissal of Luling's intervention on March 27, 1981, the matter had been continued on numerous occasions at the request of the parties for a multiplicity of reasons or, apparently, for no reason at all. On one occasion, the case was continued simply because the State had retained a new attorney to represent it, and he needed additional time to familiarize himself with the proceeding. On another occasion, trial was continued so that interrogatories could be answered. Thus, to the extent the dismissal of Luling's intervention was based upon untimeliness, the trial judge abused his discretion.
In dismissing Luling's intervention, the trial judge also assigned substantive reasons. His first stated that clause seven of the collateral mortgage granted by Luling to Great American was an express transfer of the right to compensation for expropriation which terminated Luling's personal right to receive compensation for the taking.
In Louisiana, the right to demand fair market land value and severance damages in an expropriation suit remains with the owner of the property at the time of the expropriation unless there is a specific transfer, assignment or subrogation of the personal right of the land owner to his successors in title. This right has been declared a personal one, and does not follow the land.[3]
In my view, the trial judge erroneously concluded that clause seven of the collateral mortgage was a transfer of Luling's personal right to be compensated for expropriation damages. The assignment, with "the amounts of such awards to be applied by MORTGAGEE to the reduction of the indebtedness hereby secured", is one of "awards" and not of a right to seek awards. The assignment thus provides that any amounts received by Great American are to be applied to the mortgage balance, and Great American is not free to dispose of any such awards as it might please. Luling must give Great American notice of suit, and it is obligated to execute further assignments as may be necessary to transfer the awards to Great American. Clearly, this is not an express transfer of a personal right. At best, it is a conditional assignment of the proceeds of a future judgment for the sole purpose of securing payment of the mortgage. Consequently, it is a security device and not a transfer. If it were a transfer, Great American would not have been obliged to apply the proceeds to the balance of the mortgage.
Next, the trial judge held this assignment was the sale of a personal right and became the property of the mortgagee in the same manner that the seized land became the property of the mortgagee following the foreclosure sale. The trial judge was incorrect in so ruling without taking evidence at trial because (1) the right in question may not have been sold, and (2) the right is a personal one which does not pass with a transfer of the land.[4] This was and is the primary issue in this appeal, as will be seen from the following discussion.
Next, the trial judge held invalid the argument that the seizure and sale satisfied the mortgage, so that subsequent awards arising from the taking should return to Luling, the mortgagor. The court here again assumed that all future awards "generated by" the seized property belonged to St. Charles Holding, N.V., the holder under Great American. The exhibits in the record show that the property was bid in for more than two-thirds of its value by the plaintiff, Great American, and St. Charles concedes in brief that the bid for the property and writ rights exceeded *685 the mortgage balance. It is implied in the record, and stated in the trial judge's reasons, that Great American bought the property in itself at auction. While it was entitled to do so, the fact that it received no money in return for its loan is immaterial in determining whether the mortgage was satisfied. If Great American chose to "apply the bid against the writ" and receive property instead of money at the auction, its choice does not mitigate against the fact that the mortgage was thereby satisfied.[5] If Luling is correct, the only right available to Great American at this point in the proceeding was to prove that the bid it made at the auction did not satisfy the entire balance of its mortgage. In such a situation, additional funds from any award against the State in favor of Luling would be owed to Great American under clause seven of the collateral mortgage. If the right to the entire proceeds from the taking were not sold to St. Charles, it is only entitled to be made whole on its mortgage balance. This issue must be decided.
The trial judge also held the intervention was barred by prescription against judicial sales. The present holder under Great American urges the two year prescription provided by Civil Code Article 3543 and the five year prescription of R.S. 9:5642. The court concluded, and counsel argues, that an attack on a judicial sale requires a direct attack, and the intervention of Luling is merely a collateral attack.
The plea of prescription was not filed by St. Charles Holding, N.V., then the holder under Great American, but instead was furnished by the trial judge. Article 927 of the Code of Civil Procedure prohibits the court from furnishing the plea of prescription, and this court could not consider it even if we deemed Luling's intervention to be an attack, collateral or otherwise, on the judicial sale. However, my reading of the intervention convinces me Luling does not attack the judicial sale resulting from Great American's suit for executory process. On the contrary, Luling merely seeks a determination of what was sold by the sheriff at the judicial sale.
There is much in the record to support this conclusion. First, it is conceded by all parties that the right of action to sue for expropriation damages is a personal right, and not a real right which passes with the property. The prayer of Great American's executory process proceeding sought only the sale of the "above described mortgaged property...."[6] (emphasis mine). Second, in response to the petition, the court ordered "a writ of seizure and sale issue herein as prayed for and according to law." Third, the notice of seizure and the sheriff's deed merely referred to" .... all rights arising out of ..." the expropriation suit. Thus, the question presented by Luling's intervention is not whether rights were transferred by the judicial sale, because the right to apply amounts received from the expropriation to the mortgage balance was sold, whether legally or not. Luling's intervention seeks a determination by the court as to whether the judicial sale also applies to its personal right to recover awards of expropriation over and above the amount of any balance due under the collateral mortgage, because it pledged and assigned conditionally the right to receive awards from the expropriation but did not mortgage it. The prayer of the petition for executory process only seeks the sale of mortgaged property, and the judge merely ordered the property sold "as prayed for".
Additionally, considering the fact that the foreclosure was by executory process in which the evidence must be in authentic form, there is a question of interpretation as to whether the sheriff's sale conveyed the mortgaged right to recover either all *686 sums from the expropriation proceeding, or only those sums sufficient to satisfy any mortgage balance outstanding, a question which, in my view, is clearly answerable by clause seven in the negative as to the former and in the affirmative as to the latter.
As authority for the proposition that the sheriff conveyed title to Luling's right to sue for expropriation damages, St. Charles, Inc., holding under Great American, cites Bluefields S.S. Co. v. Lala Ferraras Cangelosi S.S. Co.,[7] arguing that court recognized title to a law suit can be transferred through a judicial sale. However, the Bluefields court cited the case of Early v. Black,[8] in which it had previously said with regard to the predecessor of Civil Code Article 2652:
"The transfer spoken of in that article was a conventional assignment, between individuals capable of contracting. The defendant in the rule holds judgment by a different title; an adjudication by a public officer, at a forced sale, made by order of a competent tribunal: by this adjudication, all the rights and claims of the plaintiff in the suit, by virtue of the judgment against Early and Amelung, were vested in Black." (emphasis mine).
In the present suit intervenor holds by an adjudication of a public officer at a forced sale, but it is a matter of dispute exactly what was sold by order of a competent tribunal. This is a matter of interpretation of the sheriff's sale and not a collateral attack on it. It is also, as has been said, the main issue presented by Luling's intervention.
Finally, the trial judge held the matter was res judicata because on September 2, 1975 it determined, in ruling on an exception filed by the State of Louisiana, that Great American owned the right to prosecute the action for adequate compensation and severance damages. The doctrine of res judicata in Louisiana is established and set forth in Civil Code Article 2286, which provides as follows:
"The authority of the thing adjudged takes place only with respect to what was the object of the judgment. The thing demanded must be the same; the demand must be founded on the same cause of action; the demand must be between the same parties, and formed by them against each other in the same quality." LSA-C.C. Art. 2286.
In Mitchell v. Bertolla,[9] the Supreme Court held that Article 2286 sets forth the civilian doctrine of res judicata and not the common law doctrine. The Supreme Court further set out quite clearly that "the authority of the thing adjudged takes place only with respect to that which was the object of the judgment", and that the thing demanded must be the same, the demand must be founded on the same action, and the parties must be identical. The Supreme Court also held in Rivette v. Moreau (Estate of Mistric),[10] that a decided case precludes a second litigation only if it involves the same parties, the same cause, and the same object of demand.
In the present case, the exceptions regarding the right to prosecute the action for compensation and severance damages were filed by the State and argued between the State and Great American. The issue of Luling's right to sue was not before the court, nor was Luling a party to the proceeding. Consequently, the court's judgment of September 2, 1975 is not res judicata as to Luling.
In addition to the reasons in the trial court's judgment, the present intervenor holding under Great American argues that it and its precedessors in title acquired title to the suit for expropriation damages by acquisitive prescription of three years. Civil Code Article 3506 provides:
"If a person has possessed in good faith and by a just title, as owner, a movable thing, during three successive *687 years without interruption, he shall acquire the ownership of it by prescription unless the thing was stolen or lost." LSA-C.C. Art. 3506.
In the present case, the key words in this article are "by a just title". As discussed at length above, it is a question for interpretation whether the judicial sale transferred to Great American the right to sue for damages or merely the right to receive the proceeds of any expropriation judgment and apply it to the balance of its mortgage. Until this issue has been determined, the question of acquisitive prescription must remain open.
This court does not have before it the writ of seizure and sale in the executory process proceeding, and consequently it would be improper to render judgment on the merits of Luling's intervention at this time. Moreover, if Luling prevails, the issue of what amounts, if any, are due to Great American's successor in suit will require the taking of evidence. Consequently, the judgment appealed from by Luling should be annulled and set aside, and the matter remanded for further proceedings.
In the second appeal in this case the issue raised by the State ultimately resolves itself into a determination of whether intervenor, St. Charles Holding (which claims as a successor in title and in suit to Great American), has proved by adequate evidence that it is a successor to the original Great American and is the proper party to recover judgment against the State in this case. If, upon remand, the court finds that Luling is entitled to the damage award against the State, the issue of St. Charles' right to recover against it will become moot. Nevertheless, it is necessary to entertain the issue raised by the State's appeal in the event a result contrary to Luling ultimately will be reached.
The original intervenor, Great American Mortgage Investors, allegedly changed its name to Great American Management and Investment by amendment to its Declaration of Trust on October 28, 1975. The document changing the name of the original intervenor apparently is not a part of the public records of St. Charles Parish, nor was it introduced into evidence prior to the trial on the merits. On March 25, 1977 Great American Management and Investment filed a petition for reorganization under the prior Bankruptcy Act. The State argues, and I can find nothing in the record to contradict it, that intervenor has never shown the right to Luling's claim against the State of Louisiana in this proceeding was listed as an asset in the reorganization proceeding.[11]
According to a pleading by intervenor, Great American Management and Investment obtained court authority to sell, and did sell, all of its assets to Great American Management Investment, Inc., a Delaware corporation. The sale allegedly included the mortgaged land and the personal rights, the latter being transferred by separate bill of sale and assignment of choses in action. Intervenor further pleads that on October 23, 1979 the mortgaged land plus the interest of Great American Management & Investment, Inc. in the suit were in turn sold by it to St. Charles Holding, N.V., a corporation existing under the laws of the Netherlands Antilles. Great American Management and Investment, Inc. had not sought to be substituted as a party to the suit, but on May 19, 1980, St. Charles Holding, N.V., as successor to Great American Management and Investment, Inc., filed the ex parte motion to be substituted as defendant in lieu of Luling, as more fully discussed above, and as intervenor, in lieu of Great American.[12] The order was signed on May 26, 1980.
*688 Trial was held on the merits for compensation and severance damages from March 31, 1981 through April 3, 1981 between the State and St. Charles Holding. The minutes reflect all counsel were present each day, but the transcript clearly shows no one representing Luling was at the trial.
Subsequent to trial, the State filed an exception of no right of action on the ground that the rights in and to the law suit had not been properly transferred to St. Charles Holding, N.V. This exception was maintained by the trial court, and will be discussed in more detail below.
During the proceedings, St. Charles Holding, N.V., became the wholly owned subsidiary of St. Charles Holding, Inc., a Louisiana corporation. St. Charles Holding, N.V., was then liquidated, and its assets were distributed to St. Charles Holding, Inc., its sole shareholder. On May 26, 1981 St. Charles Holding, Inc., the present intervenor, obtained an order, on the basis of an ex parte motion by St. Charles Holding, N.V., to substitute St. Charles Holding, Inc. as defendant in this case. The State complains that the motion was granted on the basis of an uncertified copy of a purported distribution of assets of St. Charles Holding, N.V., to St. Charles Holding, Inc., which was never authenticated.
On May 26, 1981, the trial court acted on the State's exception of no right of action. The court was of the opinion the original intervenor, Great American Mortgage Investors, obtained the personal rights of Luling at the sheriff's sale pursuant to its collateral mortgage, but that the record was devoid of proof of an express transfer of Luling's personal rights from the original intervenor to Great American Management & Investment, or from the latter to Great American Management and Investment, Inc. The trial court consequently maintained the State's exception of no right of action and dismissed St. Charles Holding, Inc. as a party defendant. This resulted in the awkward situation of the court having the State before it as a party answerable for expropriation damages, with no party of record to receive those damages, since both Luling and St. Charles Holding, Inc., were then dismissed as expropriation defendants.
On June 2, 1981 St. Charles Holding, Inc. filed a motion for a new trial on the State's exception, to which it annexed exhibits. In the motion St. Charles Holding, Inc. sought to amend the pleadings and supplement the record. The exhibits attached to the motion were not certified as true copies nor otherwise authenticated. St. Charles and the State entered into a stipulation to the effect that if one Doris Appling were to testify, and if her testimony were admissible,[13] she would testify the exhibits attached to the stipulation were true copies of originals on file with Great American Management & Investment and Great American Management & Investment, Inc. and that certain statements in St. Charles' motion about the records of these two entities in its memorandum in support of a new trial were true. No attempt was made to offer these exhibits into evidence, and no other attempt was made to support the allegations contained in St. Charles' memorandum.
A hearing was held on St. Charles' application for a new trial on June 15, 1981. A review of the transcript of this hearing shows it was, at best, confused, and that the trial court acted somewhat hastily because attorneys in another trial were in court waiting to proceed. It appears that much of the confusion resulted because, in addition to the motion for a new trial, the court was presented for the first time with the motion to substitute St. Charles Holding, Inc. as defendant in place of St. Charles Holding, N.V.
In any event, the court commenced by granting the motion for a new trial. But instead of following the mandatory language of Code of Civil Procedure Article *689 1977,[14] which requires separate assignment for hearing after the granting of a new trial, the court proceeded with a determination of the issues to be decided at the new trial. The State is not in a position to complain of this irregularity, however, since it acquiesced in this procedure and merely requested the opportunity to submit a memorandum on the admissibility of the testimony of Ms. Appling and certain documents attempted to be introduced at that hearing.
Sixteen days later, on June 30, 1981, the State submitted an extensive memorandum as permitted by the trial judge on June 15, 1981. Thereafter, on July 24, 1981, the trial judge signed two judgments. The first dismissed the State's exception of no right of action, and the second decided the merits of the claim for expropriation damages.[15] However, while both judgments were signed on July 24, 1981, only the judgment dismissing the State's exception recites that it was rendered on June 15, 1981. If the judgment was, in fact, rendered on June 15, then obviously the State was not afforded the opportunity the court promised it to submit a memorandum in lieu of a formal trial.
Moreover, my examination of the record indicates the recitation that the judgment rendered on June 15, 1981 was not an oversight or an accident. The judgment on the merits, which is the next document in the record, recites that it was read, rendered, and signed on July 24, 1981. There is thus no explanation why judgment was rendered on the State's exception prior to the time allowed by the court to file its memorandum. I can only infer from the face of the record that the trial judge, to the State's prejudice, did not afford it the opportunity to brief the case as promised and ordered.
Should the trial judge reach this issue after a determination of the intervention by Luling, the amount of money involved and the importance of the issues raised dictate that the new trial granted by it on the State's exceptions be assigned for a separate evidentiary hearing and that all competent testimony and other properly authenticated evidence be considered thereat.
Both St. Charles Holding, Inc. and the State appealed from the judgment on the merits. However, the trial on the merits was held without the presence of Luling, and in the event Luling should be found the proper party defendant (as, on this record, appears likely), then Luling should have the opportunity to introduce further evidence with regard to the damages resulting from the expropriation, subject to the State's right to defend against said evidence and subject to the right of St. Charles Holding, Inc. (if it proves its chain of title) to show that all or part of any award by the State to Luling in fact belongs to it by virtue of the assignment contained in clause seven of Luling's collateral mortgage to Great American Mortgage Investors."
In my view, Luling Industrial Park was improperly dismissed from the suit both as original defendant and as intervenor. Thus, Luling was not given an opportunity to assert its claims which, on this record, appear to be valid, while St. Charles' claims do not appear to be valid. And, on this record and as stated above, the wording of the notice of seizure served on Luling in the foreclosure proceeding ("Including all rights appertaining thereto, and more specifically including all rights arising out of") this expropriation suit (emphasis mine) together with paragraph seven of the mortgage which, quite clearly, limits recovery by the mortgagee to the reduction of the indebtedness secured, require a hearing to determine the amount of that indebtedness; with Luling entitled to receive any sums over that amount.
Again on this record, it does not appear that St. Charles Holding is in fact a successor *690 to its alleged predecessors in title and therefore not a proper party to recover judgment for all compensation and severance damages.
It should be noted that the dismissal of Luling's appeal per se did not transfer any of its title rights to St. Charles Holding. Insofar as that appeal dismissal by itself is concerned, St. Charles can still only assert such claims as it may have independent of the dismissal of Luling's appeal. It should also be noted that any dismissal of any other Luling claim could be done by Luling's attorney of record only with the express authority of Luling, and the record contains no such express authority.
As I would remand the entire matter, I respectfully dissent.

ON APPLICATION FOR REHEARING
PER CURIAM.
In our opinion rendered November 17, 1983, we raised the amount of severance damages and then stated, regarding the district court decree:
"In all other respects, the judgment is affirmed."
Inasmuch as St. Charles Holding, Inc. is entitled to legal interest as determined by the legislature, we amend our November 17, 1983 opinion to read:
"Appellant St. Charles Holding, Inc. is awarded legal interest from the date the original petition was filed, until paid. The amount of legal interest is that amount set by the legislature, that is: Seven (7) per cent until September 12, 1980, ten (10) per cent from September 12, 1980 to September 11, 1981 and twelve (12) per cent from September 11, 1981 until paid. In all other respects, the judgment is affirmed."
As we make this amendment on our own motion, the application for a rehearing filed by St. Charles Holding, Inc., asking for an increase in legal interest, is moot and will not be acted upon.
NOTES
[1] Reference LSA-C.C. art. 3543 and LSA-R.S. 9:5642.
[1] As stated in Louisiana Power & Light Co. v. Churchill Farms, Inc., 292 So.2d 183 (La.1974).
[2] See State Dept. of Highways v. Eubanks, 345 So.2d 533 (La.App. 3rd Cir.1977).
[1] The record does not contain a copy of the writ of seizure and sale.
[2] See Code of Civil Procedure Article 1033.
[3] Soileau v. Gibbs, 229 La. 976, 87 So.2d 312; Gumbel v. New Orleans Terminal Co., 197 La. 439, 1 So.2d 686; McCutchen v. Texas & P. Ry. Co., 118 La. 436, 43 So. 42; Lake, Inc. v. Louisiana Power & Light Co., La.App., 318 So.2d 911; Gulf States Utilities Company v. Sonnier, La. App., 182 So.2d 200. See also Brooks v. New Orleans Public Service, La.App., 370 So.2d 686.
[4] See Lake, Inc. v. Louisiana Power & Light Co., and other cases cited in note 3.
[5] Even if the entire mortgage balance was not satisfied by the property bid in, the remainder is subject to satisfaction by the proceeds of the award assigned in clause seven of the mortgage.
[6] Counsel for the intervenor, St. Charles Holding, argues that the complete petition for executory process (certain pages of which I am unable to locate in the record) makes mention of Great American's desire to seize the personal right for damages for expropriation. However, the entire proceeding was governed by the prayer.
[7] 133 La. 424, 63 So. 96.
[8] 12 La. 205.
[9] La., 340 So.2d 287.
[10] La., 336 So.2d 864.
[11] The State claims to have attached a copy of the trust's schedule of assets in the bankruptcy proceeding to one of the State's pleadings, which now has mysteriously disappeared. There is simply no explanation for, nor inference to be drawn from, the absence of this document, since the record is in an extreme state of disarray.
[12] The original of this motion was not in the record. A copy thereof was placed in an envelope of exhibits pursuant to requests of two of the parties. The State denies having received notice of this ex parte event, and there is no indication Luling received notice thereof.
[13] The admissibility clause was specifically added by the State in handwriting and initialed.
[14] "When a new trial is granted it shall be assigned for hearing in accordance with the rules and practice of the court." See Loomis v. Connecticut General Insurance Co., La.App., 160 So.2d 270.
[15] St. Charles Holding, Inc. was also recognized as the defendant.