GAUDIN, Judge.
Appellant in these expropriation proceedings is the State of Louisiana, through the Department of Highways, contending that the monetary awards by the district court to the landowner, Lutcher and Moore Cypress Lumber Company, Inc., were excessive.
Two petitions were filed pursuant to LSA-R.S. 48:441 to 460 and Art. VI, Sec. 19.1 of the Louisiana Constitution[1] and in the lawsuits, the trial judge awarded a total of $904,236.55, plus interest, costs and the fees of various expert witnesses.
In answer to the appeals, Lutcher and Moore does not question either the public necessity or purpose of the expropriations, but it does contend that it is entitled to additional funds and that the fees of its experts should be increased.
In suit No. 10,026, 23rd Judicial District Court, the trial judge awarded $138,623.00 for the property expropriated, for rental of a servitude area and for timber loss, and $278,750.00 as severance damages, a total of $417,373.00, minus $41,154.00 placed in the registry of the court by the State at the time of the expropriation. Thus, the actual amount awarded was $376,219.00, plus interest, costs and fees of expert witnesses.
In suit No. 10,027, the trial judge awarded $71,695.00- for the property expropriated, for rental of a servitude area and for timber loss, and $415,168.55 as severance damages, a total of $486,863.25, minus $20,855.00 placed in the registry of the court. Therefore, the actual amount awarded was $466,008.55, plus interest, costs and fees of expert witnesses.
For reasons that follow, we amend these awards. In suit No. 10,026, the record justifies an award of $180,233.83, which includes $137,758.83 for the property expropriated, for rental of a servitude area and for timber loss, and $83,625.00 as severance damages, minus the $41,154.00 placed in the registry of the court.
In suit No. 10,027, we amend the award to $180,573.38, which includes $76,877.82 for the property expropriated, for rental of a servitude area and for timber loss, and $124,550.56 as severance damages, minus the $20,855.00 placed in the registry of the court.
In both suits, we amend and affirm the awards for interest, and we affirm the awards for court costs and fees of expert witnesses.
*218 BACKGROUND
In December, 1967, the State filed two petitions and expropriated a strip of land across Lutcher and Moore’s property to complete the Interstate 10 highway from New Orleans to Baton Rouge. The land taken, near the towns of Lutcher and Gramercy, was 300 feet wide and stretched east to west. A total of 225 acres was expropriated from a contiguous tract of approximately 30,000 acres.
In addition, the State acquired a temporary servitude over a 1000-foot wide strip, 714 acres, adjacent to the actual I — 10 roadway to use for muck disposal.
Lutcher and Moore’s land is traversed by the Blind River, which runs north to south. One suit (No. 10,026) expropriated the strip on the east side of the Blind River, while the other suit (No. 10,027) took the strip on the west side of the river. The State placed a total of $62,009.00 in the registry of the court, $41,154.00 in suit No. 10,026 and $20,855.00 in No. 10,027.
The following not-to-precise-scale sketch is a facsimile of several maps in evidence, showing the general layout of Lutcher and Moore’s property and the expropriated strip:
[[Image here]]
Following a lengthy trial, the district judge rendered judgment on January 14, 1983, awarding the amounts previously specified. In both judgments, legal interest was awarded as follows:
Seven per cent per annum from December 1, 1967 to September 12, 1980;
Ten per cent per annum from September 13, 1980 to September 11, 1981; and
Twelve per cent per annum from September 12, 1981 to date of payment.
Also in both suits, the fees of defendant’s experts were fixed and taxed as costs:
$5,292.15, to Raymond D. Hodges,
3,288.24, to Robert D. Hatcher,
250.00, to E. Paul Bercegeay,
3,190.00, to Kermit Williams, and
2,850.00, to John LeJeune.
The trial judge assigned reasons for:
(1) Rejecting Lutcher and Moore’s claim for clay mining possibilities;
(2) Placing a value of $500.00 per acre on the 225 acres taken;
(3) Establishing a rental value of the 714 acres used for muck disposal and setting a $50.00 per acre figure for loss of timber on these acres;
(4) Rejecting Lutcher and Moore’s claim for “... full compensation for what it *219 terms the effective taking of the muck disposal area ...” and
(5) Assessing severance damages of $693,918.55 to the property north of the 1-10 while finding no severance damages to defendant’s land south of the 1-10.
On appeal, the State argues that the district court decrees were based on “... legal errors and manifest errors of fact ...” Lutcher and Moore, on the other hand, suggests that the district court judgments should be affirmed except in these instances:
(1) Lutcher and Moore should have been compensated (a) for the permanent taking of a 1000-foot long drainage area adjacent to the highway and (b) for damages to timber harvesting in a so-called devaluation zone north of the 1-10, and
(2) Defendant’s expert witnesses should have been paid $40,860.78.
Lutcher and Moore does not now suggest that severance damages should have been awarded for the property south of the I—10, nor does Lutcher and Moore argue that the property has or had clay mining potential.
TRIAL TESTIMONY
While each expropriation case is unique in some respects, the trial judge normally has to make an award for the land actually taken, based on the fair market value at the time of the expropriation, and make an award for severance damages if the property remaining after the taking has lessened in value.
Two things make the instant case uncommon. First, an additional award has to be made for temporary use of 714 acres used for muck storage and for timber loss on these acres; and, secondly, fair market values had to be determined for an area of approximately 30,000 dissimilar acres.
This case lasted 32 days, during which time the State called as witnesses:
(1) Charles Eslinger, the I-10’s section engineer and an expert in highway design;
(2) John Starring, the project engineer who described the right-of-way zone as a wet swamp with no access except by water;
(3) Eugene Waguespack, a civil engineer who surveyed the area;
(4) Lewis Peters, an expert appraiser of timberland and farmland who said that the virgin timber was gone, having been logged in the 1890-1920 period by pullboat operations, that the highest and best use of the property was for timber growth and recreation and that the landowner’s loss was $49,917.57, which included the value of the land taken, the value of the temporary rental servitude and the value of timber that was destroyed;
(5) Max Derbes, an expert in real estate appraisals, who placed Lutcher and Moore’s loss at $62,071.00, which included $20,242.00 for the land taken and $47,-769.00 for servitude rental and loss of timber; and
(6) Chester Driggers, another expert in real estate appraisal, who said the landowner should be paid $68,910.00.
In response, Lutcher and Moore called:
(1) Raymond Hodges, a civil engineer who said that the 1-10 had severed whatever limited overland access the property had, that large boats could not pass under the Blind River bridge and that the landowner’s loss amounted to $6,438,275.00;
(2) Edward Carmouehe, Lutcher and Moore’s president, who testified about the company’s future plan for the area;
(3) Robert Hatcher, timber and forestry expert, who said that the I—10 presented a serious barrier to future logging operations, that a “timber devaluation zone” now exists on Lutcher and Moore’s property and that the landowner’s timber loss was $164,817.82, which included a 25 per cent reduction in value of the timber in the devaluation zone;
(4) Paul Bercegeay, a petroleum and chemical engineer who testified about clay mining possibilities;
*220 (5) Kermit Williams, an expert in real estate who itemized Lutcher and Moore’s loss at $1,425,776.00; and
(6) John Lejeune, another real estate expert and the former senior appraiser for the Department of Highways, who said that there was not adequate clearance under the Blind River bridge to build a roadway, that the land north of the 1-10 could now be reached only by boat and that severance damages amounted to $685,440.00, adding that the property closest to the I — 10 had dropped in value from $1,100.00 per acre to $140.00 per acre, primarily because clay mining possibilities had been lost.
THE AWARDS
After receiving these diverse views, the trial judge found that the highest and best use of the 225 expropriated acres and the 714 servitude acres was “... a combination of industrial, residential and recreational use ...,” and he assigned an overall fair market value of $500.00 per acre at the time of the taking.
The fair market value is the worth of property considered in- light of its highest and best use, this being the most favorable employment to which the land is acceptable and may reasonably be put to use in the not too distant future. State v. Rapier, 246 La. 150, 164 So.2d 280 (1964).
In arriving at the $500.00 per acre figure, the trial judge favorably considered several comparable sales, particularly a Trosclair-to-Rittenberg sale in January of 1965 for $642.00 an acre for 99 nearby acres, and the opinions of Mr. Williams and Mr. Lejeune.
The State’s experts testified that the highest and best use of Lutcher and Moore’s property was for growing timber and for recreation, and they placed per-acre values as low as $66.02. Apparently, these estimates were disregarded by the trial judge as being too low.
Regardless, the record does support a $500.00 per acre value on the 225 taken acres and the 714 acres used for muck disposal, and we will not disturb these determinations.
With regard to the worth of the temporary servitude, the trial judge used an annual rental figure of eight per cent of land value, a percentage figure testified to by several expert witnesses including Mr. Derbes and Mr. Williams. Mr. Lejeune said that a 10 per cent figure was appropriate, but the trial judge decided on the lesser figure.
An eight per cent rental return on $357,-000.00 (714 acres at $500.00 per acre) is $29,560.00 per year, or $2,463.33 a month. The muck storage area was used for two years and five months, establishing the total servitude rental value at $71,436.65.
The trial judge stated that he had “... little difficulty ...” in placing the timber loss on the servitude zone at $50.00 an acre, noting that “there is little doubt as to the accuracy of this value.” The record does support the $50.00 per acre assessment, and we will not upset it.
Of the 225 acres taken, 146 acres (65 per cent) were expropriated in suit No. 10,026, and 79 acres (35 per cent) in suit No. 10,-027. Likewise, 464 of the 714 servitude acres (65 per cent) are in suit No. 10,026, and 250 acres (35 per cent) in suit No. 10,027.
In suit No. 10,026, the record sub: stantiates these awards:
$73,125.00, for 146 acres taken at $500.00 per acre;
$46,433.83, for 464 acres rented at eight per cent of value for two years, five months; and
$18,200.00, for 464 acres of timber loss at $50.00 per acre.
These awards total $137,758.83, or slightly less than the amount designated by the trial judge.
In suit No. 10,027, the record substantiates these awards:
$37,375.00, for 79 acres taken at $500.00 per acre;
*221 $25,002.82, for 250 acres rented at eight per cent of value for two years, five months; and
$12,500.00, for 250 acres of timber loss at $50.00 per acre.
These figures add up to $76,877.82, approximately $5,000.00 more than the trial judge awarded.
SEVERANCE DAMAGES
Following the expropriations, Lutcher and Moore was left with 5,575 acres north of the 1-10 and east of the Blind River (suit No. 10,026) and 8,303.371 acres north of the I — 10 and west of the river (suit No. 10,027).
The State’s experts described these acres as swamp lands, devoid of meaningful timber growth and usable mainly for recreational purposes. Lutcher and Moore tried to show, through its witnesses, that the area north of the highway was not a swamp but an area of tide lands with industrial, timber harvesting and clay mining possibilities. Tide lands are subject to water overflow and are different from swamps, which are constantly under water.
The trial judge described Lutcher and Moore’s property “... as a tree swamp subject to tidal overflow. It is uninhabited and unimproved except for certain recreational facilities of a rather primitive nature, such as hunting and fishing camps and structures related to outdoor activities.”
Before assessing severance damages to the acres north of the 1-10, the trial judge first had to determine if severance damages were due, then the amount if they were owed.
Severance damages are the difference in value of the remaining property immediately before and immediately after the taking. The before and after test may be applied to segmented areas as well as to the property in its entirety. Town of Rayville v. Thomason, 404 So.2d 1290, (La.App. 2nd Cir.1981); and State, Dept. of Highways v. Luling Industrial Park, 443 So.2d 672 (La.App. 5th Cir.1983), writs denied at 444 So.2d 1247.
Accordingly, the trial judge could award severance damages to the lands north of the I — 10 although deciding that property south of the interstate had not lessened in value.
There is no exclusive or artificial formula for determining severance damages, but the awards must be reasonable and must be related to adduced testimony and documentary evidence. Louisiana Power & Light Co. v. Churchill Farms, Inc., 292 So.2d 183 (La.1974).
The trial judge concluded that the areas north of the I — 10 had suffered a 10 per cent reduction in value. He stated:
“The testimony of all of the experts taken together makes it clear that there was a denial of access to the defendant’s property north of the new highway, that the presence of I — 10 has an adverse effect on recreational and timber activities and that it has virtually precluded from all time any possibility of any industrial development of that property ...”
Mr. Williams assigned a 10 per cent diminution in value to the lands north of the I — 10, and he valued the property at $1,000.00 an acre if clay could be mined and $150.00 per acre if land produced only timber.
Mr. Lejeune, too, said there was a 10 per cent drop in value. He valued the property near the I — 10 at $1,100.00 an acre, including clay deposits.
Mr. Hatcher said that the I — 10 was an obstruction that would raise timber harvesting costs.
The State’s experts were more conservative in their estimates, setting per acre value no higher than $100.00 for the area north of the interstate, and they refused to admit to any severance damages. Mr. Derbes even suggested that this property had increased in value “... because of its new increased prominence caused by the taking. People, when the highway is completed, will pass by the land and see it, so that their interest in it ... would be improved ...” Mr. Derbes’ optimistic opinion notwithstanding, the trial judge was satis *222 fied that the property north of the I — 10 had been cut off by the roadway and had suffered a 10 per cent reduction in value. The record is supportive of this assessment, and we cannot say that the trial judge erred in this respect. However, once clay mining possibilities were dismissed by the trial judge as being too speculative, the record does not support his across-the-board valuation of $500.00 per acre. This sweeping evaluation included the 225 acres expropriated and the 714 servitude acres as well as the thousands of acres north of the 1-10.
The trial judge said that the testimony of Lutcher and Moore’s experts was “... very credible ...,” and it is apparent that he placed more faith in the precepts of Mr. Williams and appellee’s other witnesses than in the State’s experts. We have carefully reviewed Mr. Williams’ testimony and except in the areas immediately adjacent to the expropriated corridor, he does not value the land north of the 1-10 higher than $150.00 an acre unless clay mining potential exists. Clay mining possibilities were soundly disaffirmed by the trial judge, and Lutcher and Moore, on appeal, is not contesting this rejection. Hence, we cannot, for severance damages purposes, value the property north of the 1-10 at higher than $150.00 an acre. This is, of course, an average per acre value. The acres close to the expropriated strip are worth $500.00 per acre or perhaps slightly less, while the per acre values diminish as distance from the I — 10 increases.
Severance damages, ergo, are 10 per cent of $150.00, or $15.00 an acre. In suit No. 10,026, severance damages are $83,625.00 (5,575 acres times $15.00). In suit No. 10,027, severance damages are $124,550.56 (8,803.371 acres times $15.00).
APPELLEE’S CONTENTIONS
Lutcher and Moore maintains that it should also have been compensated:
(1) for the State’s effective taking of the muck disposal area by the installation of drainage canals, and
(2) for causing the cost of timber harvesting to rise in a so-called timber devaluation zone, a lateral strip of land immediately north of and running parallel with the 1-10.
Lutcher and Moore cites LSA-R.S. 48:223 as authority for demanding payment for the taking of the muck disposal area.
The statute reads, in pertinent part:
“The department may construct canals, ditches, or drains sufficient in its judgment to properly drain any highway embraced in the system of state highways constructed or to be constructed through any lands of private persons. The rights of way for these canals may be acquired in the same manner and on the same basis of compensation as provided for acquiring rights of way for highways.”
In his “Reasons for Judgment,” the trial judge recognized the fact that drainage laterals had been built. He said that he had “... admiration for defendant’s ingenious arguments ...,” but that Lutcher and Moore’s “... contention that it is entitled to additional compensation is found to be without merit. There is no testimony to indicate that the defendant has been harmed in any way. On the contrary, it should be observed, it has obtained some special benefits from these ditches which make the property more useful and more valuable than it was before the plaintiff began work.”
The record does support the trial judge’s denial of compensation for the canals, and it also supports his refusal to allow damages for increased harvesting expenses in the timber devaluation zone. All of the acres north of the 1-10 sustained a 10 per cent devaluation, and there was no precise testimony indicating that increased harvesting costs would cause property devaluation in excess of the 10 per cent figure testified to by Mr. Williams and Mr. Lejeune.
LEGAL INTEREST AND EXPERTS’ FEES
The trial judge’s computation of legal interest was statutorily correct, ex *223 cept that five per cent instead of seven per cent should have been awarded from December 1, 1967 to September 12, 1970, and seven per cent from September 12, 1970 to September 12, 1980.
The fixing of experts’ fees is within the sound discretion of the trial judge and should not be raised or diminished unless an abuse is shown. The fees are fixed by the trial judge with reference to the value of time and the degree of learning or skill required. Kalmn, Inc. v. Empiregas Corporation, 276 So.2d 276 (La.App. 3rd Cir.1981), and numerous other cases.
Here, we find no misuse of discretion, and we affirm the fees enumerated in the judgments, despite Lutcher and Moore’s contention that the amounts paid or owed to its expert witnesses exceeds the sums judicially , awarded.
DECREE
In suit No. 10,026, we amend the award to Lutcher and Moore to $221,383.83, minus $41,154.00 deposited in the registry of the court.
In suit No. 10,027, we amend the award to Lutcher and Moore to $201,428.38, minus $20,855.00 deposited in the registry of the court.
Interest is awarded as heretofore stated, and all other parts of both suits are affirmed. Each party to bear its appeal costs.
AMENDED AND AFFIRMED

. Louisiana Constitution of 1921.